**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GABRIEL BORDENAVE, Derivatively on Behalf of FIVE BELOW, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOEL D. ANDERSON, KENNETH R. BULL, MICHAEL F. DEVINE, III, THOMAS G. VELLIOS, RONALD L. SARGENT, THOMAS M. RYAN, KATHLEEN S. BARCLAY, KAREN BOWMAN, CATHERINE E. BUGGELN, BERNARD KIM, DINESH S. LATHI, RICHARD L. MARKEE, MIMI E. VAUGHN, AND ZUHAIRAH S. WASHINGTON, <br><br> Defendants, <br><br> and <br><br> FIVE BELOW, INC. <br><br> Nominal Defendant. | Case No: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Gabriel Bordenave ("Plaintiff") by and through his undersigned counsel, submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of Nominal Defendant, Five Below, Inc. ("Five Below" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties arising from, *inter alia*, the issuance of materially false and misleading statements, the failure to maintain adequate internal controls and make a good faith correction of the problems therewith, and the wrongful refusals of Plaintiff's litigation demands, as well as for unjust enrichment, insider trading, corporate waste, and contribution pursuant to the Securities and Exchange Act of 1934. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes, without limitation, review and analysis of the following: (a) public filings made by the Company and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) press releases, news articles, shareholder communications, and other publicly disseminated information; (c) the Company's September 10, 2025 Report of the Special Litigation Committee ("SLC Report"); (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action, *In re Five Below, Inc., Securities Litigation*, No. 2:24-cv-03638-GAM (E.D. Pa) (the "Securities Class Action"), and (e) other matters of public record. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE AND SUMMARY OF THE ACTION**

1. This shareholder derivative action is brought on behalf of nominal defendant Five Below to redress injuries sustained by the Company as a result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment, violations of federal securities laws and related misconduct

by certain current and former officers and directors of the Company ("Individual Defendants"). The misconduct alleged herein occurred from November 30, 2022 through July 16, 2024 (the "Relevant Period").

2.      Five Below is a specialty value retailer that markets itself as uniquely capable of identifying emerging consumer trends and rapidly delivering "trend-right" merchandise to its customers. The Company sells products across multiple categories, including Style, Room, Sports, Tech, Create, Party, Candy, and seasonal merchandise, with a business model premised on offering exciting and frequently changing assortments of products that appeal to its core tween and teen customer base.

3.      During the Relevant Period, Five Below pursued an aggressive growth strategy centered on the expansion of its high-priced "Five Beyond" offerings and its so-called "Triple-Double" initiative, under which the Company sought to triple its store base by 2030 while doubling sales and more than doubling earnings per share. The success of this strategy depended upon the Company's ability to execute its purported trend-right merchandising model by accurately identifying customer preferences, sourcing desirable products, allocating inventory effectively, and maintaining compelling in-store experiences across an expanding footprint of stores.

4.      Throughout the Relevant Period, the Individual Defendants repeatedly touted the Company's merchandising discipline and represented to investors that Five Below excelled at identifying trends, rapidly capitalizing on emerging consumer demand, stocking its stores with products that customers wanted to purchase, and adapting to changing customer preferences. The Individual Defendants further emphasized that the Company's success depended upon its ability to timely identify and deliver trend-right merchandise throughout its stores.

- 2 -

5.      Those representations were materially false and misleading. In truth, Five Below was increasingly unable to execute the very strategy it touted to investors. Rather than identifying and procuring trend-right products, the Company had moved away from the core aspects of its business, expanded its product assortment without adequate merchandising discipline, stocked stale merchandise lacking the "newness" and "wow" that had historically differentiated the brand, and failed to maintain effective inventory controls. The Company struggled to identify, purchase, allocate, and stock merchandise that resonated with consumers, undermining the success of its Five Beyond and Triple-Double initiatives.

6.      Rather than disclose these operational failures, the Individual Defendants repeatedly attributed Five Below's disappointing results to "shrink," or inventory losses caused by theft. Defendants characterized shrink as an industry-wide and societal problem, citing organized retail crime and perceived deficiencies in local law enforcement and prosecution efforts. Defendants thereby represented that external factors, rather than internal operational deficiencies, were primarily responsible for the Company's deteriorating performance. In reality, Five Below's declining performance stemmed in significant part from its inability to execute its trend-right strategy, maintain effective inventory controls, and stock stores with products that resonated with customers.

7.      The truth regarding Five Below's operational failures began to emerge on June 5, 2024, when Five Below announced disappointing first quarter results, including declining comparable sales, declining operating income, declining net income, and declining earnings per share. Analysts questioned whether the Company's problems were self-inflicted and attributable to stale products and merchandising failures rather than macroeconomic conditions. Five Below's

stock price fell from $132.79 per share on June 5, 2024 to $118.72 per share on June 6, 2024, erasing approximately $774 million in market capitalization.

8.  The full extent of the Company's operational failures became clearer on July 16, 2024, when Five Below announced the immediate departure of President and Chief Executive Officer Joel D. Anderson and disclosed significantly weaker second-quarter results. Analysts reported that Company management acknowledged that Five Below had strayed from its historical playbook and needed to return to trend-right products, extreme value, and a differentiated customer experience. Analysts further reported management admissions that product assortments had become stale and that merchandising execution failures had contributed to the Company's decline. In response, Five Below's stock price declined from $102.07 per share on July 16, 2024 to $75.75 per share on July 18, 2024, eliminating approximately $1.4 billion in additional market capitalization.

9.  As a result of the foregoing misconduct, Five Below became the subject of the Securities Class Action. On August 25, 2025, the court in the Securities Class Action denied in substantial part defendants' motion to dismiss, concluding that the complaint adequately alleged materially false and misleading statements and scienter as to certain defendants.

10.  In denying the motion to dismiss, the court concluded that plaintiffs had plausibly alleged that Five Below was unable to effectively execute its purported trend-right merchandising strategy and instead stocked stores with products that failed to resonate with customers. The court further concluded that plaintiffs had adequately alleged that defendants' public statements concerning the Company's merchandising capabilities and the causes of its deteriorating performance were materially misleading, and that the former employee allegations concerning

merchandising failures, inventory deficiencies, and operational problems were sufficiently reliable to support those allegations.

11. Subsequent admissions by Company management further confirmed that Five Below's operational problems were not primarily attributable to shrink or other external factors. On August 28, 2024, management acknowledged that the Company had lost focus on its core customers and had strayed from the merchandising principles that historically differentiated the brand. Management emphasized the need to return to trend-right products, compelling value, and a differentiated customer experience and recognized that the Company had moved away from the merchandising and operational disciplines that had previously driven its success. These admissions corroborated the allegations that the Company's deteriorating performance resulted from internal merchandising and operational failures rather than the external factors previously emphasized to investors.

12. As a consequence of the misconduct alleged herein, and the resulting Securities Class Action, Five Below has incurred and continues to incur, substantial legal expenses, reputational harm, and exposure to significant liability, all to the detriment of the Company and its shareholders.

13. Furthermore, certain of the Individual Defendants breached their fiduciary duties by causing Five Below to repurchase more than 770,000 shares of Company stock while that stock traded at prices artificially inflated by the misconduct alleged herein, resulting in an unnecessary expenditure of corporate assets and causing the Company to materially overpay for its own shares.

14. Additionally, while Five Below's stock price remained artificially inflated by the false and misleading statements described herein, certain Individual Defendants exploited their positions as corporate fiduciaries and sold personally held shares of Company stock, obtaining

substantial personal benefits while in possession of material nonpublic information concerning the Company's operational difficulties.

15.    In light of these events, Plaintiff submitted a pre-suit demand ("Litigation Demand") to the Board of Directors (the "Board") requesting that Five Below investigate and pursue claims against those responsible for the Company's injuries.[1] Rather than pursue those claims, the Board delegated review and analysis of the Litigation Demand to a Special Litigation Committee ("SLC"), which recommended that the Litigation Demand be refused. The Board adopted that recommendation.[2]

16.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

17.    Because the Board's refusal of Plaintiff's Litigation Demand was not the product of an independent, good-faith, and reasonable investigation and did not constitute a valid exercise of

---

[1] A true and correct copy of the Plaintiff's Litigation Demand is attached hereto as Exhibit A.

[2] A true and correct copy of the SLC's response to Plaintiff's counsel is attached as Exhibit B.

business judgment, the refusal is not entitled to judicial deference and cannot bar the prosecution of this derivative action.

## JURISDICTION

18.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, over claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)), Rule 14a-9 (17 C.F.R. §240.14a-9) promulgated thereunder, and Plaintiff's claim for contribution under Sections 10(b) and 21D of the Exchange Act, 15 U.S.C §§ 78j(b) and 78u-4.

19.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims asserted herein that they form part of the same case or controversy under Article III of the United States Constitution.

20.     This action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice. The conduct complained of herein was directed to and had foreseeable effects within this District.

22.     Venue is proper in this Court pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391(b) because a substantial portion of the acts, omissions, transactions, and events giving rise to the claims asserted herein occurred in this District. Additionally, one or more of the

Defendants resides in, maintains executive offices in, conducts business in, and/or caused harm that was felt within this District. The related Securities Class Action arising from substantially the same underlying misconduct is also pending in this District.

23. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

24. Plaintiff has been a continuous Five Below shareholder since February 2021 and has been a shareholder of Five Below common stock at all relevant times. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

25. ***Nominal Defendant Five Below*** is incorporated under the laws of the Commonwealth of Pennsylvania, and the Company's principal executive offices are located at 701 Market Street, Suite 300, Philadelphia, PA, 19106. Five Below's securities trade on the Nasdaq Global Select Market under the ticker symbol "FIVE."

### Officer Defendants

26. ***Defendant Joel D. Anderson*** ("Anderson") served as the Company's President and Chief Executive Officer ("CEO") and as a member of the Company's Board of Directors from 2015 until July 2024. During the Relevant Period, Anderson was the Company's highest-ranking executive officer and exercised substantial authority over Five Below's operations, strategic direction, public statements, and disclosures. Anderson served as the Company's principal public spokesperson during the Relevant Period, regularly participating in earnings calls, investor

conferences, and analyst presentations. Anderson signed the Company's Forms 10-K and related Sarbanes-Oxley certifications filed with the SEC during the Relevant Period. Anderson was named as a defendant in the related Securities Class Action. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Anderson received approximately $7,026,551 in total compensation in fiscal 2022, $10,185,352 in fiscal 2023, and $8,104,417 in fiscal 2024, consisting of salary, stock awards, incentive compensation, and other benefits. During the Relevant Period, Defendant Anderson also sold substantial amounts of Five Below stock, receiving proceeds exceeding $7.5 million from transactions alleged more fully below.

27.    ***Defendant Kenneth R. Bull*** ("Bull") has served as Five Below's Chief Operating Officer since March 2023. Bull previously served as the Company's Chief Financial Officer and Treasurer from 2012 until March 2023.  Following Anderson's departure, Bull served as Interim President and Chief Executive Officer from July 2024 through December 2024. Defendant Bull joined Five Below in 2005 as Senior Vice President, Finance and also served as Secretary. During the Relevant Period, Bull exercised substantial authority over the Company's financial reporting, operations, internal controls, and public disclosures. Bull regularly participated in the Company's earnings calls and investor presentations and signed the Company's Forms 10-K, Forms 10-Q, and related certifications while serving as Chief Financial Officer. Defendant Bull was named as a defendant in the related Securities Class Action. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Bull received approximately $1,788,729 in total compensation in fiscal 2022, $4,185,840 in fiscal 2023, and $6,294,557 in fiscal 2024, consisting of salary, stock awards, incentive compensation, and other benefits. During the Relevant Period, Defendant Bull also sold substantial amounts of Five Below stock, receiving proceeds exceeding $1.5 million from transactions alleged more fully below.

28.    Defendants Anderson and Bull are collectively referred to herein as the "Officer Defendants."

**Director Defendants**

29.    ***Defendant Thomas G. Vellios*** ("Vellios") co-founded Five Below and served as a Director since inception. During the Relevant Period, he served as Executive Chairman of the Board. As Executive Chairman, Vellios exercised substantial influence over the Company's merchandising strategy, growth initiatives, operational direction, and public messaging. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Vellios received approximately $500,194 in total compensation in fiscal 2022, $498,455 in fiscal 2023, and $5,645,557 in fiscal 2024 from the Company. During the Relevant Period, Defendant Vellios also sold substantial amounts of Five Below stock, receiving proceeds exceeding $15.3 million from transactions alleged more fully below.

30.    ***Defendant Michael F. Devine*** ("Devine") has served as a director of Five Below since 2013 and currently serves as Chair of the Board. As Chair of the Board, Devine participated in overseeing the Board's consideration of Plaintiff's Litigation Demand and the Board's ultimate decision to reject the Demand. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Devine received approximately $276,796 in total compensation in fiscal 2022, $274,845 in fiscal 2023, and $290,945 in fiscal 2024 from the Company.

31.    ***Defendant Ronald L. Sargent*** ("Sargent") has served as a director of Five Below since 2004. During his tenure, Sargent served as a member of the Board's Compensation Committee and Nominating and Corporate Governance Committee, and beginning in June 2025, as Chair of the Talent and Compensation Committee. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Sargent received approximately

$249,942 in total compensation in fiscal 2022, $249,845 in fiscal 2023, and $262,945 in fiscal 2024 from the Company. During the Relevant Period, Defendant Sargent also sold substantial amounts of Five Below stock, receiving proceeds exceeding $2 million from transactions alleged more fully below.

32.     *Defendant Thomas M. Ryan* ("Ryan") has served as a director of Five Below since 2011. During his tenure, Ryan has served as a member of the Board's Nominating and Corporate Governance Committee and the Investment Committee. Through those committee responsibilities, Ryan participated in the Company's governance functions and capital allocation decisions, including oversight of the Company's stock repurchase program. ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████ According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Ryan received approximately $259,214 in total compensation in fiscal 2022, $249,845 in fiscal 2023, and $262,945 in fiscal 2024.

33.     *Defendant Kathleen S. Barclay* ("Barclay") has served as a director of Five Below since 2015.   During her tenure, Barclay serves as a member of the Board's Compensation Committee and has served as Chair of the Board's Nominating and Corporate Governance Committee since 2021. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Barclay received approximately $269,942 in total compensation in fiscal 2022, $269,845 in fiscal 2023, and $285,945 in fiscal 2024 from the Company. During the Relevant Period, Defendant Barclay also sold substantial amounts of Five Below stock, receiving proceeds exceeding $1.1 million from transactions alleged more fully below.

34.     *Defendant Richard L. Markee* ("Markee") has served as a director of Five Below

- 11 -

since 2016.  During his tenure, Markee serves as a member of the Board's Audit Committee and has been designated by the Company as an "audit committee financial expert." As an Audit Committee member and designated financial expert, Markee was responsible for oversight of the Company's financial reporting, internal controls, disclosure controls, and risk management processes. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Markee received approximately $249,942 in total compensation in fiscal 2022, $249,845 in fiscal 2023, and $262,945 in fiscal 2024 from the Company.

35.     **Defendant Dinesh S. Lathi** ("Lathi") has served as a director of Five Below since 2018.  During his tenure, Lathi has served as a member of the Board's Audit Committee since 2022 and has been designated by the Company as an "audit committee financial expert." As an Audit Committee member and designated financial expert, Lathi participated in the Board's oversight of the Company's financial reporting, disclosure controls, and internal controls. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Lathi received approximately $268,816 in total compensation in fiscal 2022, $279,845 in fiscal 2023, and $295,945 in fiscal 2024 from the Company.

36.     **Defendant Zuhairah S. Washington** ("Washington") has served as a director of Five Below since 2022.  During her tenure, Washington serves as a member of the Board's Audit Committee, Compensation Committee and Talent and Compensation Committee. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Washington received approximately $249,942 in total compensation in fiscal 2022, $249,845 in fiscal 2023, and $262,945 in fiscal 2024 from the Company.

37.     **Defendant Mimi E. Vaughn** ("Vaughn") has served as a director of Five Below since 2023.  During her tenure, Vaughn serves as a member of the Board's Audit Committee and,

beginning in June 2025, as a member of the Talent and Compensation Committee and the Nominating and Corporate Governance Committee. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Vaughn received approximately $129,806 in total compensation in fiscal 2023, and $262,945 in fiscal 2024 from the Company.

38.    **Defendant Karen Bowman** ("Bowman") has served as a director of Five Below since January 2024.   Upon joining the Board, Bowman was appointed to the Board's Audit Committee and Nominating and Corporate Governance Committee and currently serves as Chair of the Nominating and Corporate Governance Committee. In those capacities, Bowman participated in the Board's oversight of the Company's financial reporting, internal controls, corporate governance, and director nomination processes. ██████████████████

████████████████████████████████████████████████

█████████████████████ According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Bowman received approximately $62,980 in total compensation in fiscal 2023, and $262,945 in fiscal 2024 from the Company.

39.    **Defendant Catherine E. Buggeln** ("Buggeln") has served as a director of Five Below from 2015 through 2022. During her tenure, Buggeln served as a member of the Board's Nominating and Corporate Governance Committee. According to the Company's proxy statement filed on Schedule 14A with the SEC, Defendant Buggeln received approximately $249,942 in total compensation in fiscal 2022 from the Company. During the Relevant Period, Defendant Buggeln also sold substantial amounts of Five Below stock, receiving proceeds exceeding $491,000 from transactions alleged more fully below.

40.    **Defendant Bernard Kim** ("Kim") has served as a director of Five Below from 2022 to 2024. During his tenure, Kim served as a member of the Board's Nominating and Corporate

Governance Committee. According to the Company's proxy statements filed on Schedule 14A with the SEC, Defendant Kim received approximately $218,283 in total compensation in fiscal 2022, $249,845 in fiscal 2023, and $262,945 in fiscal 2024 from the Company.

41.     Defendants Vellios, Devine, Sargent, Ryan, Barclay, Markee, Lathi, Washington, Vaughn, Bowman, Buggeln, Kim, and Anderson are collectively referred to herein as the "Director Defendants."

42.     The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

**Relevant Non-Parties**

43.     ***Non-Party Winnie Park*** ("Park") has served as CEO and director of Five Below since December 2024. According to the Company's proxy statements filed on Schedule 14A with the SEC, Park received approximately $1,204,010 in fiscal 2024 from the Company.

44.     ***Non-Party Kristy Chipman*** ("Chipman") became Five Below's Chief Financial Officer and Treasurer in July 2023, succeeding Defendant Bull after his promotion to Chief Operating Officer. Chipman served as the Company's principal financial officer during portions of the Relevant Period and participated in the Company's financial reporting and disclosure processes. Plaintiff does not presently assert claims against Chipman because she was not identified in Plaintiff's Litigation Demand.

<b><u>SUBSTANTIVE ALLEGATIONS</u></b>

**A.  Five Below's History, Business and Operations**

45.     Five Below is a specialty value retailer headquartered in Philadelphia, Pennsylvania. Founded in 2002, the Company operates stores throughout the United States selling a broad assortment of merchandise primarily priced between $1 and $5. Five Below sells more

than 4,000 products across eight merchandise categories: Style, Room, Sports, Tech, Create, Party, Candy, and New & Now. The Company's business model is designed to appeal principally to tween and teen consumers by offering a frequently changing assortment of products at extreme value price points.

46.    Because Five Below sells relatively inexpensive merchandise at modest margins, the Company depends upon high sales volume to generate profitability. A key component of Five Below's business strategy has long been its ability to identify emerging consumer preferences and quickly source, distribute, and stock products that align with those trends. Effective merchandising, inventory allocation, inventory tracking, and in-stock execution were therefore mission-critical functions because the Company's profitability depended upon ensuring that trend-right products reached store shelves in a timely manner.

47.    Five Below repeatedly represented to investors that its ability to identify and capitalize on trends constituted one of its principal competitive advantages. The Company's annual reports stated that "[t]he principal basis upon which we compete is by offering a dynamic, edited assortment of trend-right products," and described its trend-right merchandise strategy as one of the Company's key drivers of success.

48.    Five Below's ability to execute this strategy was critical not only because trend-right products generate direct sales, but because such products attracted new customers, increased store traffic, and encouraged additional purchases across the Company's broader merchandise assortment. Accordingly, the systems and controls governing merchandising, inventory allocation, inventory management, and store-level product availability constituted mission-critical systems and controls essential to the Company's operations and profitability.

### B. Five Below's Expansion Strategy and Triple-Double Initiative

49.    In recent years, Five Below significantly expanded both the scope of its merchandise offerings and the size of its store footprint. In 2019, the Company introduced "Ten Below," a section of its stores offering products priced above Five Below's traditional price point but generally below $10. In 2021, Defendant Anderson announced the expansion and rebranding of that concept as "Five Beyond," which provided the Company additional flexibility to offer higher-priced merchandise.

50.    Five Below rapidly expanded the Five Beyond concept. By 2022, approximately 250 stores had been converted to include Five Beyond sections, and in March 2023, Defendant Anderson declared that "our goal is for Five Beyond everywhere."

51.    The Company also aggressively pursued geographic expansion. When Five Below first became a public company in 2013, it operated approximately 244 stores in 18 states and represented that it had capacity to operate as many as 2,000 stores nationwide. By early 2024, Five below operated more than 1,500 stores across 43 states and claimed that it ultimately had the capacity to operate up to 3,500 stores.

52.    On March 30, 2022, Defendant Anderson outlined the Company's long-term strategic vision, which Five Below branded its "Triple-Double" initiative. Under this plan, the Company sought to triple its store count by 2030 while doubling sales and more than doubling earnings per share. The Triple-Double initiative remained a central focus of management throughout the Relevant Period. In fact, in March 2023, Defendant Bull was promoted to Chief Operating Officer to focus on the "important building blocks" of the Company's Triple-Double growth vision and stated that he looked forward to "driving the next chapter of growth at Five Below."

53.     Defendants repeatedly touted Five Below's expansion initiatives as evidence of the Company's operational strength and long-term growth potential. Investors were assured that Five Below possessed the infrastructure, merchandising expertise, and organizational capabilities necessary to support these ambitious objectives.

### C.  Five Below's Operational Failures

54.     What Defendants failed to disclose was that, during the Relevant Period, Five Below increasingly struggled to execute the very trend-right strategy it repeatedly touted as central to its success because its mission-critical merchandising, inventory-allocation, and inventory-control infrastructure was failing.

55.     According to numerous former employees described in the Securities Class Action Consolidated Amended Complaint (the "Former Employees" or "FEs"), Five Below experienced widespread operational deficiencies involving merchandising execution, inventory allocation, product availability, fulfillment operations, and store expansion during the Relevant Period. These former employees occupied different positions throughout the Company, including district management, store operations, merchandising, fulfillment, and corporate functions, and worked in different geographic regions and operational areas. Nevertheless, they consistently described similar problems involving the Company's ability to identify, allocate, distribute, and stock trend-right merchandise.

56.     As alleged in the Securities Class Action, FE-1, a former District Manager responsible for between twelve and sixteen stores, reported that stores routinely lacked sufficient quantities of highly sought-after products, including Squishmallows and Hello Kitty merchandise, and that requests for additional inventory frequently went unanswered. According to FE-1, stores often failed to receive products customers sought to purchase, resulting in lost sales opportunities

and customer frustration. FE-1 further reported that Defendant Anderson personally visited stores experiencing these issues.

57.    FE-2, another former District Manager, similarly reported that stores frequently experienced inventory shortages, including shortages affecting newly opened stores and Five Beyond locations. According to FE-2, stores often lacked sufficient merchandise to fill displays, and employees sometimes rearranged merchandise to conceal partially empty shelves. FE-2 further reported difficulties obtaining sufficient quantities of desirable products and described inventory-allocation problems affecting store operations.

58.    FE-3 described operational strain associated with the Company's aggressive Triple-Double growth initiatives and expansion efforts. FE-3 reported staffing shortages and operational pressures that adversely affected store execution. FE-7, who served as Associate Director of Fulfillment Center Operations, similarly described operational and fulfillment challenges associated with the Company's growth initiatives and reported concerns regarding the strain placed upon the Company's operations.

59.    FE-4 reported that stores frequently received excessive quantities of slow-moving and unwanted merchandise while lacking products customers actively sought to purchase. FE-4 described inventory imbalances and merchandising problems that contributed to excess inventory and operational difficulties.

60.    As alleged in the Securities Class Action, FE-5 reported that management received information concerning operational and inventory issues affecting stores and product availability. FE-6 similarly described fulfillment and distribution problems affecting the Company's ability to timely move merchandise to stores. FE-8 reported concerns regarding store cannibalization and the effects of the Company's rapid expansion strategy on existing locations.

61.     As detailed in the Securities Class Action, collectively, the Former Employees described widespread deficiencies involving merchandising execution, inventory allocation, product availability, fulfillment operations, and store expansion. Although these individuals worked in different operational functions and geographic regions, their accounts corroborated one another and consistently described an inability to ensure that trend-right merchandise reached store shelves in sufficient quantities and at appropriate times.

62.     Judge McHugh summarized the allegations in the Securities Class Action as asserting that "Five Below was unable to stock stores with trending items and instead filled stores with unpopular items that clogged shelves and disappointed customers." The Court further observed that "[t]he issue wasn't Five Below's ability to identify trending items, but rather its inability to stock trend-right, in-demand merchandise at its stores." Thus, as the Court recognized, the issue was not merely whether Five Below could identify trends in the abstract, but whether the Company's merchandising, inventory-allocation, and inventory-control systems were capable of ensuring that trend-right products actually reached store shelves. These functions were mission-critical to Five Below's business model. The Court further recognized that multiple former employees occupying different operational roles and geographic locations described similar operational deficiencies, thereby supporting the reliability and consistency of those allegations.

63.     The Former Employees further reported that information concerning inventory shortages, merchandising problems, product availability, operational difficulties, and store performance was communicated to management through store visits, operational reporting, inventory data, management meetings, and other reporting mechanisms. Certain Former Employees reported that senior management personnel, including Defendants Anderson and Bull, personally observed or received information concerning these conditions. These allegations

- 19 -

support the inference that senior management possessed information concerning the operational deficiencies described herein.

### D. Defendants Mischaracterized Five Below's Problems as External Factors

64.    Rather than disclose these Company-specific operational failures, Defendants repeatedly attributed disappointing results to "shrink" and broader macroeconomic conditions.

65.    Defendants characterized shrink principally as an industry-wide consequence of organized retail crime, theft, and insufficient prosecution. Through earnings calls, SEC filings, and other public statements, Defendants represented that those external pressures, rather than deficiencies in the Company's mission-critical merchandising, inventory allocation, inventory management, and store-level product availability functions, were responsible for Five Below's deteriorating performance.

66.    As alleged in the Securities Class Action, Defendants blamed shrink for what was, in reality, a lack of "infrastructure and ability to identify trends, as well as the ability to allocate and track inventory so that 'trend-right' products were available in sufficient volume to meet and drive customer demand." See Securities Class Action, Dkt. 40 at ¶4. The district court subsequently held that Plaintiffs had plausibly alleged that Defendants' statements concerning shrink were misleading because Defendants attributed the Company's deteriorating performance to external theft-related factors while failing to disclose material internal inventory-management and operational problems. By doing so, Defendants concealed the extent to which Five Below's disappointing performance was attributable to self-inflicted operational shortcomings rather than external factors beyond the Company's control.

### E. The Individual Defendants' Misconduct

67.    During the Relevant Period, the Individual Defendants, by virtue of their positions

as officers and directors of Five Below, directly participated in, authorized, approved, and/or caused the dissemination of the Company's public statements and disclosures. The Individual Defendants exercised control over the content of Five Below's SEC filings, earnings calls, investor presentations, press releases and other communications to investors and the market. As set forth below, the Individual Defendants caused Five Below to make materially false and misleading statements and omissions, exposing the Company to substantial legal, financial, and reputational harm.

68. On November 30, 2022, during Five Below's third quarter fiscal 2022 earnings call, Defendant Anderson boasted about the "great progress" Five Below had made "on several initiatives in the third quarter," and assured investors that Five Below was "in a great position for the fourth quarter." Anderson further represented: "Our stores are stocked and ready with an amazing assortment of value products that promise to delight our customers[.]" and noted that Five Below was "set up to deliver products to our growing store base even more efficiently." During the same call, Defendant Bull stated: "Our teams continue to move quickly to adjust to changing customer preferences."

69. At the January 9, 2023 ICR Conference, Defendants Anderson and Bull participated in a question-and-answer session with Citigroup's Paul Lejuez. During the conference, Defendant Anderson stated:

> [I]t was a very good holiday. Trends were strong, Squishmallows, Slime Lickers, Hello Kitty. And I think that's something that—I've been here eight years now, we've really got a good cadence with those [trends], how to get into them, how to get out of them.

During the same conference, in response to a question about the Company's ability to capitalize on new trends, Anderson described Five Below's ability to capitalize on trends as part of the Company's "secret sauce" and stated: "And we're pretty nimble and quick. There's not a lot of

- 21 -

bureaucracy at Five Below. When we identify something, we move really quick to get that in the store, test it and then push it out to the stores." Bull further emphasized the Company's purported merchandising capabilities, stating that trends were "really kind of the mindset that we have" and that trend products drove both traffic and customer acquisition.

70.     On March 15, 2023, during the Company's fourth quarter and fiscal year 2022 earnings call, Defendant Anderson claimed "[w]e stay on top of hot trends and swiftly move to capitalize on them." Anderson further represented:

> The flexibility of our model . . . is unique and enables swift recognition and introduction of trend-right and relevant products to our customers, and we honed our expertise and discipline to effectively manage the constant cycling of these trends.

During that same call, Defendant Bull stated that the Company had experienced "higher-than-expected shrink," and that "[o]n an annual basis, shrink for 2022 was approximately 30 basis points higher than what we experienced in 2021."

71.     In the Company's Annual Report on Form 10-K filed with the SEC on March 16, 2023, for fiscal year ended January 28, 2023, the Company and its Officers and Directors represented the Company's trend-right strategy and capabilities. Defendants Anderson, Bull, Vellios, Barclay, Buggeln, Devine, Kim, Lathi, Markee, Ryan, Sargent, and Washington signed the filing. In particular, Form 10-K stated:

> We monitor trends in the ever-changing tween and teen markets and are able to quickly identify and respond to trends.
>
> *        *        *
>
> We deliver an edited assortment of trend-right as well as everyday products within each of our category worlds that changes frequently to create a sense of anticipation and freshness[.]

72.     On June 1, 2023, Five Below issued a press release announcing its fiscal first quarter fiscal 2023 financial results. In the press release, Anderson touted the trend-right products,

stating:

> We are pleased with our first quarter results that were in line with our outlook highlighted by a 3.9% comp transaction increase. While our customers face multiple macro headwinds, we continue to be there for them, flexing our offering to bring them the Wow products they need and want. Our broad-based sales performance and transaction trends demonstrate that we are gaining trips and customers through our amazing value, trend-right products and Five Beyond prototype. Looking to the rest of the year, we remain focused on playing offense to drive increased market share. We now plan to open a record 200-plus new stores and complete over 400 conversions to the new Five Beyond prototype in 2023 while building a strong pipeline of new stores for 2024. With the headwinds of the pandemic moderating, combined with our continued experience and efficiency-based initiatives, we believe we are well-positioned to continue our high growth.

73.     On August 30, 2023, the Company held an earnings call for the fiscal second quarter of 2023 with analysts and investors. Consistent with Defendants' repeated assurances that Five Below's core merchandising capabilities remained strong, Defendant Anderson continued to tout the Company's purported ability to execute its trend-right strategy, stating that Five Below could "quickly capitalize on a trend."

74.     At the same time, Defendants increasingly began to attribute the Company's operational and financial challenges to external factors. When asked about shrink increase and mitigation measures, Defendant Bull stated: "I think you're all familiar with the recent media and videos that are out there where retailers across the sector are experiencing increased levels of shrink and related crime incidents and we are not immune to this as we're finding out." Similarly, Defendant Anderson suggested that Five Below's difficulties stemmed from broader societal conditions and inadequate law enforcement, stating:

> And so, where is it coming from? It's coming on all angles. And you've got several cities now which just simply aren't prosecuting below the $500 level. Sadly, our hometown here in Philly is a city that's seen some of our highest shrink rates. And we watched Target and we watched Wawa exit Center City. And so while I don't think we're yet at that extreme of closing Five Below stores there, these are the type of mitigation strategies that will be included as we consider what to do if we don't

- 23 -

see things improve.

75. Thus, while continuing to assure investors that Five Below retained the nimble, trend-right capabilities that supposedly distinguish the Company from its competitors, Defendants simultaneously began shifting blame for the Company's emerging difficulties to organized retail crime, theft, and broader societal issues, creating a misleading impression that external factors, rather than the Company's own shortcoming, were responsible for Five Below's deteriorating performance.

76. On November 29, 2023, Five Below held an earnings call for the fiscal third quarter of 2023. During the call, Anderson stated, "[o]ur merchants have sourced fresh and trend-right products at outstanding values."

77. That same day, the Company issued a press release announcing its fiscal third quarter 2023 financial results. In the press release, Defendant Anderson stated:

> We are very pleased with our results and operational execution in the third quarter. We exceeded our guidance for sales, comparable sales and EPS, as our value offering resonated with customers and we effectively capitalized on multiple trends. We opened a record 74 new stores in the third quarter and are on track to open over 200 new stores for the year. We have also successfully converted over 400 stores to our new Five Beyond format, ending the third quarter with approximately 50% of our comparable store base in this format. We entered the all-important holiday quarter ready to Wow our customers with an outstanding assortment of gifts and stocking stuffers at incredible value. We are well-positioned to execute this holiday season and deliver on our goals for the year.

78. On November 30, 2023, Anderson appeared on Fox Business' *Mornings with Maria* to discuss the Company's earnings report. During the interview, host Maria Bartiromo asked Anderson to discuss shrink, adding "and what it really means, is theft." Anderson replied: "We talked about theft in our second quarter call. Theft is real, its impacting all retailers." He further stated: "this is a real societal problem and we've got to learn together with the politicians to figure this out."

- 24 -

79.     On March 20, 2024, the Company issued a press release announcing its financial results for the fiscal fourth quarter and fiscal year ended February 3, 2024. Despite reporting earnings at the low end of guidance, Anderson attributed the Company's disappointing profitability to shrink, stating: "The benefit of strong sales performance to our profitability was offset by higher than anticipated shrink headwinds, resulting in earnings at the low end of our guidance range." Anderson specifically represented that the Company's earnings shortfall was "100% shrink related," thereby assuring investors that the Company's disappointing profitability was attributable solely to shrink rather than to deficiencies in merchandising execution, inventory allocation, product assortment, or operational execution. During the same earnings release and earnings call, Chief Financial Officer Chipman also discussed the Company's financial results, inventory position, and profitability trends, thereby participating in the dissemination of the Company's explanation that shrink, rather than Company-specific merchandising and operational deficiencies, accounted for the Company's disappointing results.

80.     During the earnings call that same day, Anderson and Chief Financial Officer Chipman discussed the Company's financial performance, profitability, inventory position, and operational results. Anderson continued to tout Five Below's purported merchandising strengths, stating that the "flexibility of our model with our 8 worlds is unique and enables our teams to quickly introduce trend-right relevant products to our customers. At the same time, Anderson reassured investors that the Company's earnings shortfall was not attributable to problems with its merchandising strategy or operational execution, stating that the Company's disappointing financial results and earnings miss was "fully attributed to higher-than-planned shrink."

81.     Anderson's statement that the Company's disappointing results could be "fully attributed" to shrink conveyed to investors that Five Below's merchandising execution, inventory

- 25 -

allocation, product assortment, and operational controls remained fundamentally sound. Management later acknowledged that operational and merchandising deficiencies had developed over several years and materially contributed to the Company's deteriorating performance.

82.     On March 21, 2024, Five Below filed its Annual Report on Form 10-K for the fiscal year ended February 3, 2024. Anderson, Vellios, Barclay, Bowman, Devine, Kim, Lathi, Markee, Ryan, Sargent, Vaughn, and Washington signed the filing. Consistent with Defendants' prior representations concerning Five Below's purported competitive strengths, the Form 10-K stated: "We monitor trends in the ever-changing tween and teen markets and are able to quickly identify and respond to trends." The Form 10-K further represented: "We deliver an edited assortment of trend-right as well as everyday products within each of our category worlds that changes frequently to create a sense of anticipation and freshness[.]"

83.     Non-Party Chipman also participated in the Company's public disclosures concerning Five Below's financial performance, operating trends, inventory position, and profitability throughout the Relevant Period. As Chief Financial Officer, Chipman spoke on behalf of the Company concerning matters directly relating to the Company's operating results and financial condition. The federal securities action arising from the same underlying events specifically challenged certain statements made by Chipman concerning the Company's performance and operations, further demonstrating that senior management collectively participated in the Company's disclosure process.

84.     The foregoing statements were materially false and misleading because, throughout the Relevant Period, Defendants failed to disclose that Five Below was experiencing significant deterioration in its ability to execute its purported trend-right merchandising strategy. Although Defendants repeatedly represented that the Company could quickly capitalize on trends, rapidly

move merchandise into stores, and effectively manage changing customer preferences, Five Below increasingly struggled to allocate, distribute, and stock in-demand products at its stores. Stores frequently lacked trending merchandise sought by customers while simultaneously receiving excessive quantities of slow-moving and unpopular products. Former employees described persistent shortages of high-demand products, excessive inventory of unwanted merchandise, and repeated failures to deliver trending items to stores despite known customer demand. Defendants further failed to disclose that the Company's rapid store expansion, increasing product assortment, and operational pressures had materially impaired merchandising execution and inventory allocation, thereby undermining the Company's ability to deliver the nimble and trend-right merchandising capabilities that Defendants repeatedly described as central to Five Below's competitive advantage and financial success.

85. Rather than disclose these Company-specific operational and merchandising problems, Defendants increasingly attributed Five Below's deteriorating performance to external factors, including shrink, organized retail crime, prosecutorial policies, inflation, and broader macroeconomic conditions. Defendants repeatedly assured investors that merchandising execution, product assortment, and operational performance remained strong while attributing disappointing financial results to shrink and retail theft. In doing so, Defendants created the misleading impression that the Company's deteriorating performance stemmed principally from factors outside management's control, while concealing that deficiencies in merchandising execution, inventory allocation, operational execution, and the implementation of the Company's growth initiatives materially contributed to declining sales and profitability.

**F. The Truth Emerges**

86. On June 5, 2024, Five Below issued a press release announcing its earnings for the

fiscal first quarter of 2024. Anderson described the sales results as disappointing and securities analysts at Truist characterized the results as "painful." In particular, comparable sales decreased by 2.3% from the first quarter of fiscal year 2023, operating income declined 14.6% from $42.4 million to $36.2 million, net income declined 16% from $37.5 million to $31.5 million, and diluted income per common share declined 15% from $0.67 to $0.57. These disclosures did not merely prompt analyst criticism. They revealed declining financial performance, management acknowledgments concerning unfavorable product assortments and aging merchandise, and operational problems that analysts and investors then sought to understand and evaluate.

87.     During the corresponding earnings call, Anderson attempted to blame macro trends, claiming that "consumers are feeling the impact of multiple years of inflation . . . and are, therefore, far more deliberate with their discretionary dollars." However, he also acknowledged that the Company's unfavorable product mix significantly impacted its financial results, noting the Company's "declining sales and older merchandise trends led by Squishmallows." These statements constituted an acknowledgment that Five Below's merchandise assortment and product mix were contributing to the Company's deteriorating performance. Thus, Five Below's inability to consistently source, allocate, distribute, and stock trend-right products in sufficient quantities, maintain effective merchandising and inventory controls, mitigate shrink as represented, and successfully execute its expansion strategy were among the true causes of the Company's declining results.

88.     The market's reaction to these disclosures was significant because analysts increasingly questioned whether Five Below's disappointing results stemmed from the external factors repeatedly cited by Defendants or from the Company's own merchandising, inventory, and operational shortcomings. The analyst reports discussed below are relevant not because they

establish the underlying facts, but because they reflect how the market interpreted Five Below's disclosures and management's subsequent admissions.

89.     Analysts immediately began questioning the Company's explanation. An analyst from Barclays Bank PLC ("Barclays") pushed back on the Company's attribution of financial problems to macroeconomic trends, pointing out that "[w]e've obviously seen declines in discretionary demand at many of your peers," but "up until this quarter, Five had outperformed a lot of those peers," while "that gap is narrowed a lot this quarter." Anderson conceded that it had "proven harder for us to lap some of the big trends from last year," and claimed "that's probably been the biggest difference from last year's outperformance to this year." This was the Company's first partial disclosure that its trend-right failures were a cause of its deteriorating financial results. Anderson's admission that it had become "harder" to capitalize on prior trends directly contradicted Defendants' repeated representations that Five Below could quickly identify, source, and introduce trend-right products into its stores.

90.     A Truist Securities, Inc. ("Truist") analyst questioned whether the harms might be "self-inflicted," noting that "the [other] off-price retailers are actually performing well" and questioning whether it was possible Five Below's "product[s] [had] gotten a little bit stale." Anderson pushed back, claiming that for the retailers the analyst mentioned "a large percentage of their business is apparel," and claiming that the dollar stores such as Dollar General and Dollar Tree were also experiencing "negative comps and discretionary categories."

91.     Similarly, a UBS Investment Bank ("UBS") analyst questioned whether the slowdown was "caused by simply increased competition, whether it's some new dollar-store competitor or inexpensive Asian direct sellers or marketplaces that are gaining increased traction in the United States?" Anderson deflected blame away from the effects of competition and claimed

- 29 -

that Five Below's "quarterly research" asked "where do you go when you want fun, trend-right, high-value items," and claimed that "we have not seen some of the retailers you just mentioned move up the list on that." Anderson further insisted that Five Below had "sliced our sales performance by where our competition is and so we didn't really see any trend that would lead it to say when we're near these retailers or those retailers are closer to us that our performance was worse." Finally, Anderson claimed that if the slowdown were attributable to increased competition it would not have dropped off "in the middle of the quarter."

92.     A Goldman Sachs Group, Inc. analyst likewise questioned whether Five Below's expansion strategy was benefiting the Company when she spotlighted the problem of "cannibalization." Anderson insisted that, while cannibalization increased from "in the 50 basis points" pre-Coronavirus disease 2019 pandemic to "in the 80 to 100 basis points annually," he did not "expect that to be any contributing factor," based on the fact that it could not account for the sales drop in the middle of the quarter.

93.     Anderson concluded by continuing to portray Five Below's challenges as industry-wide. He claimed that "our core customer, they are clearly prioritizing needs over wants, and that had a big impact on our performance in [the first quarter]."

94.     Nevertheless, analysts increasingly questioned whether Five Below's difficulties actually stemmed from internal execution failures rather than the broader macroeconomic conditions as claimed by the Company. For instance, Truist reported that "while the macro has clearly been a headwind . . . , the company also saw incremental weakness from some of their older products like Squishmallows." Truist reported that it had a call with Five Below's management, where the Company's executives admitted it was a "fair assumption" that "there just isn't a lot of 'new' and 'exciting product' right now in the stores." Truist's report was particularly

significant because management itself reportedly acknowledged that it was a "fair assumption" that there was not enough "new" and "exciting product" in stores.

95.     Truist further explained that the "sales slowdown has also coincided with multiple store-related changes," including the growth of Five Beyond, which has higher price points, the shrink mitigation efforts and a move to associate-assisted checkout which "may not have been a smooth process, based on various industry sources," and that "the store is currently more 'stale' than it has been in quite some time." Similarly, Wells Fargo Securities, LLC ("Wells Fargo") acknowledged that notwithstanding any "macro" issues it was surprising that Five Below's "business has slowed this much with more mixed results elsewhere" (i.e., among competitors). Wells Fargo dropped its price target from $180 to $145, almost 20%.

96.     UBS similarly predicted that, while Anderson "attributed the weakness to the macro, the market will likely be skeptical of this explanation," and that "[a]t least some will assign the explanation to a combination of rising competition, some give-back of the outperformance from the last few years, the lack of newness in the product assortment and some degradation of the company's unit economics."

97.     However, the market also expressed some optimism and at least partially accepted the Company's explanation of what happened. For instance, Telsey Advisory Group concluded that "the stock is close to a bottom, with the bad news reflected in the share price" and relayed its expectation that "the company's focus on merchandising and operational improvement [will] boost performance."

98.     Following these disclosures, Five Below's stock price dropped from $132.79 per share on June 5, 2024, to $118.72 per share on June 6, 2024, a one-day decline of 10.6%, erasing approximately $774 million in market capitalization.

- 31 -

99.     On July 16, 2024, Five Below issued a press release announcing that Defendant Anderson was stepping down as the Company's Chief Executive Officer and President and resigning from the Board of Directors, effective immediately. The Company further announced that Defendant Bull, had been appointed Interim President and Chief Executive Officer.

100.     In the same press release, Five Below disclosed second quarter-to-date results, revealing that comparable sales had declined 5% from the same period in the prior year, and the Company expected "an approximate 6% to 7% decrease in comparable sales" for the quarter as a whole. Five Below further disclosed that "[d]iluted income per common share is expected to be in the range of $0.53 to $0.56." This represented a decline of up to 19% from the Company's previously issued second-quarter diluted earnings per share guidance of $0.57 to $0.69, which Five Below had reaffirmed just weeks earlier during its June 5, 2024 earnings call.

101.     The disclosure prompted a wave of analyst downgrades and reports that increasingly identified Company-specific operational failures, rather than shrink, macroeconomic conditions, or organized retail crime, as the principal drivers of Five Below's deteriorating performance. JP Morgan Securities LLC ("JP Morgan") reduced its price target from $122 to $87, or nearly 29%. On July 17, 2024, JP Morgan also published statements from a conversation with management where a Five Below executive specifically acknowledged the Company had "strayed" from its historic three-part playbook during and after the pandemic and needed to "(i) Get back to trend-right product, (ii) Refocus on extreme values, and (iii) Execute to a more consistent, fun and enjoyable in-store experience." JP Morgan further reported that management had identified merchandising shortcomings as a key issue, including "the need to improve trend-right products in store," describing seasonal product offerings as "stale" and noting that trend sales penetration had declined year-over-year following the prior year's Squishmallows-driven performance. These

- 32 -

admissions were particularly significant because they directly contradicted Defendants' repeated representations during the Relevant Period that Five Below remained effective in identifying, sourcing, allocating, and stocking trend-right merchandise.

102.   Also on July 17, 2024, Guggenheim Securities, LLC ("Guggenheim") lowered its price target from $165 to $125, more than 24%, and observed that Five Below "shouldn't be as vulnerable" to macroeconomic pressures as its results suggested and claimed that management, in discussions, had "stressed multiple times a need to return to the extreme value product distortion and differentiated 'wow' experience that made the brand unique." Guggenheim also questioned the impact of the higher-priced Five Beyond, and the "elimination of self-checkout."

103.   The same day, Barclays lowered the Company from "Overweight" to "Equal Weight" and concluded, macro trends aside, that Five Below "should be performing better, with the right offering, as a value retailer in the current environment." Barclays further observed that Five Below appeared to be shifting toward an acknowledgement of "company specific issues, including shortfalls in product and value."

104.   William Blair downgraded Five Below to "Market Perform," noting that management had acknowledged that "many of the recent pressures are self-inflicted," suggesting the headwinds were structural rather than temporary. William Blair further reported that Five Below intended to return to its roots by driving demand through "trend-right product, extreme value, and an experiential shopping experience."

105.   Similarly, Deutsche Bank Securities Inc. ("Deutsche Bank") downgraded Five Below to "Hold," reporting that addressing the Company's "self-inflicted issues could take time." Based on its own follow-up discussions with Five Below management, Deutsche Bank reported that "[m]anagement indicated that a significant part of this year's top-line challenges is self-

inflicted from less-than-exciting product assortment and likely suboptimal pricing." These admissions were particularly significant because management itself attributed Five Below's declining performance to Company-specific merchandising and pricing deficiencies rather than the external factors, including shrink and macroeconomic conditions, that Defendants had repeatedly emphasized during the Relevant Period.

106.    These disclosures, together with management's admissions and the analyst reports reacting to those disclosures, confirmed that Five Below's challenges were attributable, at least in substantial part, to Company-specific failures in Five Below's mission-critical merchandising and inventory-control infrastructure rather than solely to shrink or broader macroeconomic conditions. Analysts further reported that Five Below intended to return to its roots by emphasizing trend-right products, extreme value, and the differentiated shopping experience that historically drove the Company's success. The analyst reports are significant because they reflected the market's assessment of information disclosed by the Company and admissions attributed to Company management, not because the analysts independently created the underlying facts.

107.    Following the disclosures, and as analysts increasingly attributed Five Below's disappointing performance and abrupt management changes to Company-specific operational deficiencies, Five Below's stock plummeted. The Company's stock price fell from $102.07 per share on July 16, 2024, to $75.75 per share on July 18, 2024, a two-day decline of more than 25% and a market capitalization loss of $1.4 billion, dropping to Five Below's lowest closing price since June of 2018.

## G.  Subsequent Events

108.    The disclosures of March 20, 2024, June 5, 2024, and July 16, 2024 together with management's subsequent admissions, revealed that Five Below had failed to execute the trend-

right merchandising strategy it repeatedly touted to investors, had misleadingly attributed its deteriorating performance principally to shrink and external factors, and had pursued an expansion strategy and SKU expansion strategy that management later admitted had become overly aggressive, diverted attention from merchandising execution, and placed substantial strain on the organization. In the months that followed, Five Below's own executives made a series of admissions confirming that these problems were structural, longstanding, and largely self-inflicted.

109.    On August 28, 2024, Five Below announced its financial results for the second quarter of fiscal 2024. The Company reported that comparable sales had declined 5.7% year-over-year, while operating income, net income, and diluted earnings per share each decreased compared to the same period in the prior year.

110.    During the accompanying earnings call, Executive Chairman Defendant Vellios acknowledged that the Company had "lost some of that sharp focus on our core customers over the past few years" and announced that Five Below would undertake a strategic and operational refocus designed to restore value, improve execution, and return the Company to its historical strengths.

111.    Interim Chief Executive Officer Defendant Bull similarly admitted that Five Below had strayed from the fundamentals that historically drove the Company's success. Bull acknowledged that the Company had effectively "lost its way" and admitted that Five Below had expanded its assortments without sufficient discipline, had moved away from its core tween and teen customer base, and had failed to consistently deliver the "trend-right," high-quality, extreme-value products that differentiated the Company from its competitors and had failed to maintain the merchandising and inventory controls necessary to consistently do so. These admissions directly

contradicted Defendants' repeated representations during the Relevant Period that Five Below remained effective in identifying, sourcing, allocating, and stocking trend-right merchandise and that the Company's operational execution and merchandising capabilities remained strong.

112.    Bull further explained that value required a combination of price, quality, and trend relevance, and conceded that Five Below had failed to maintain that balance. These admissions directly contradicted Defendants' repeated assurances throughout the Relevant Period that the Company remained nimble and effective in identifying, sourcing, allocating, and stocking trend-right merchandise. Management further emphasized the importance of increasing "newness" and improving trend relevance, which directly addressed many of the merchandising, inventory, and product allocation deficiencies previously described by former employees and identified by analysts following the Company's corrective disclosures.

113.    Management also announced significant operational changes designed to reverse the deficiencies that had developed during the Relevant Period. Five Below disclosed that it would substantially reduce its merchandise assortment, return SKU counts closer to pre-pandemic levels, reevaluate its store operating model, moderate previously announced store expansion plans, and reassess aspects of its Five Beyond initiative.

114.    Bull further acknowledged that Five Below's highly publicized "Triple-Double" initiative had become overly aggressive and had imposed substantial strain on the organization. He explained that the Company's focus on ambitious growth objectives had diverted attention from merchandising execution, innovation, and customer experience. Bull specifically stated that the Triple-Double initiative had become "too aggressive and put a tremendous amount of pressure on the organization."

115.    Significantly, Bull conceded that these operational shortcomings had not arisen

suddenly but instead had developed over several years. In doing so, management effectively confirmed that the problems underlying Five Below's disappointing performance existed throughout the Relevant Period during which Defendants repeatedly assured investors that the Company's merchandising capabilities, mission-critical merchandising and inventory controls, operational execution, and growth initiatives remained strong. Bull's acknowledgment that these problems had developed over "the past few years" directly contradicted Defendants' repeated assurances during the Relevant Period that Five Below remained operationally strong. These admissions were particularly significant because they came directly from Company leadership and corroborated the operational deficiencies alleged throughout this Complaint.

116.    These admissions are particularly significant because they came directly from Company leadership following the corrective disclosures and after the departure of Defendant Anderson. Unlike the challenged statements made during the Relevant Period, these admissions were made in connection with remediation efforts and strategic restructuring and therefore further support the conclusion that the operational deficiencies alleged herein existed throughout the Relevant Period.

117.    Securities analysts interpreted these disclosures as evidence that Five Below was abandoning aspects of its prior strategy and attempting to repair longstanding execution failures. William Blair characterized the Company's efforts as "Going Back to the Basics," while Evercore ISI reported that Five Below was narrowing its focus to product, pricing, and customer experience after years of operational drift.

118.    On December 4, 2024, Five Below announced that it had appointed Winnie Park, who had served as Chief Executive Officer of Forever 21 since 2022, as the Company's new Chief Executive Officer effective December 16, 2024. The decision to recruit an outside executive rather

than elevate existing leadership reflected the Board's recognition that substantial changes in leadership were necessary to address the Company's operational and strategic failures.

119. During the same December 4, 2024 earnings call, management acknowledged that many of the problems previously disclosed remained unresolved. Bull stated that Five Below still needed to restore its focus on high-quality, trend-right, extreme-value merchandise targeted to its core demographic. Defendant Vellios similarly acknowledged that the Company had significant work remaining to streamline assortments, increase newness, and reestablish Five Below's reputation for delivering trend-right products. Management's emphasis on increasing "newness" and improving trend relevance directly addressed many of the merchandising, inventory, and product allocation deficiencies previously described by former employees and identified by analysts following the Company's corrective disclosures.

120. Five Below also acknowledged that excessive SKU expansion during the Relevant Period had contributed to the Company's merchandising difficulties. Bull explained that SKU counts had expanded well beyond pre-pandemic levels, increasing complexity and crowding out innovation. Management announced plans to reduce SKU counts by up to twenty percent to create space for new, trend-driven products.

121. Analysts likewise concluded that Five Below's difficulties reflected longstanding Company-specific failures rather than temporary macroeconomic pressures. Research reports from Craig-Hallum, Wells Fargo, and BNP Paribas identified merchandising missteps, SKU overexpansion, deficiencies in shrink management, remote leadership practices, and the pressures associated with the Triple-Double initiative as key contributors to the Company's operational decline. These conclusions were based in substantial part on management's own descriptions of the Company's operational shortcomings and announced remediation efforts.

122.    These post-Relevant Period admissions and remedial measures further corroborate that Five Below's deteriorating performance stemmed substantially from Company-specific operational failures that Defendants failed to disclose during the Relevant Period, rather than solely from shrink, organized retail crime, inflation, or other external factors repeatedly invoked by Defendants to explain the Company's disappointing results.

123.    The subsequent admissions by Vellios and Bull were particularly significant because they came from management after Defendant Anderson's departure and while the Company was attempting to remediate its operational deficiencies. These executives had no apparent incentive to overstate the Company's prior failures. Their admissions therefore strongly corroborated the accounts provided by former employees and analysts that Five Below had suffered from longstanding merchandising, inventory, and operational deficiencies during the Relevant Period.

124.    Despite these subsequent admissions, the implementation of remedial measures designed to address the very deficiencies alleged herein, and management's acknowledgment that many of the Company's problems had developed over several years, the Board nevertheless refused Plaintiff's Litigation Demand and declined to pursue recovery on behalf of Five Below against those responsible for the misconduct described in this Complaint.

**H. Five Below's Merchandising and Inventory-Control Infrastructure Was Mission-Critical to the Company's Business**

125.    Five Below's ability to identify, source, allocate, distribute, track, and stock trend-right merchandise was mission-critical to the Company's business model. As repeatedly represented to investors, Five Below's competitive advantage depended upon its ability to offer a dynamic assortment of trend-right products that resonated with its core tween and teen customer base. Because Five Below operated on relatively low margins, the Company's profitability

- 39 -

depended upon maintaining effective merchandising, inventory-management, and inventory-control systems capable of ensuring that desirable products were identified, purchased, allocated to appropriate stores, accurately tracked, and timely placed on store shelves.

126. As alleged herein, Five Below failed to maintain and oversee this mission-critical merchandising and inventory-control infrastructure. The Company experienced persistent deficiencies in allocating inventory to stores, managing merchandise assortments, tracking inventory, distinguishing actual shrink from inventory-management failures, and ensuring that trend-right products reached stores in sufficient quantities and at appropriate times. The Company also failed to ensure that management and the Board received accurate information concerning the causes of its deteriorating performance. These systems were not ancillary business functions. They constituted the operational infrastructure upon which Five Below's trend-right strategy, inventory management, shrink reporting, expansion initiatives, and public disclosures depended.

127. These deficiencies struck at the core of Five Below's business model. The Former Employees described persistent failures involving several of the Company's mission-critical functions. FE-1 and FE-2 reported repeated shortages of highly sought-after and trend-right merchandise and failures to supply stores with products customers actively sought to purchase. FE-4 described inventory imbalances, excess quantities of unwanted merchandise, and inventory-related issues affecting store operations. FE-6 and FE-7 described fulfillment and distribution problems and operational strain associated with the Company's growth initiatives. FE-3 and FE-8 reported operational pressures resulting from the Company's aggressive expansion strategy and its effects on existing stores. Collectively, the Former Employees described widespread deficiencies involving merchandising execution, inventory allocation, product availability, fulfillment operations, and store expansion. At the same time, Defendants repeatedly assured investors that

- 40 -

Five Below excelled at identifying trends, sourcing trend-right products, rapidly introducing products into stores, and responding quickly to changing customer demand.

128. The Individual Defendants knew, or consciously disregarded, these problems. The issues concerned the Company's core operations and were necessarily reflected in operational reports, merchandising data, inventory allocation data, inventory information, sales trends, shrink analyses, store-level performance metrics, and Board-level discussions regarding the Company's growth initiatives, financial performance, and public disclosures. Because Five Below repeatedly represented that trend-right merchandising and rapid execution were central to its success, the Individual Defendants could not reasonably have been unaware of the Company's inability to effectively execute that strategy. Because these matters concerned mission-critical operational functions repeatedly discussed in SEC filings, earnings calls, analyst communications, and Board-level strategic planning, a reasonable investigation of the misconduct alleged herein necessarily required an evaluation of the adequacy of the Company's merchandising, inventory-allocation, inventory-tracking, and disclosure-control systems.

129. Rather than ensure that Five Below maintained adequate merchandising, inventory, operational, and disclosure controls, the Individual Defendants allowed the Company to continue issuing misleading statements concerning its merchandising capabilities, inventory management, shrink, and operational performance. These failures ultimately exposed Five Below to securities litigation, substantial legal expenses, reputational harm, inflated stock repurchases, substantial market capitalization losses, and other corporate losses.

130. The significance of these operational systems was subsequently recognized by the federal court in the Securities Class Action, which concluded that the relevant issue was not Five Below's ability to identify trends in the abstract, but rather its ability to stock trend-right, in-

demand merchandise in its stores. The court further recognized that multiple former employees occupying different operational positions and geographic regions consistently described deficiencies in merchandising execution, inventory allocation, and product availability.

## RELATED LITIGATION

131.    As a result of the misconduct alleged herein, including the dissemination of materially false and misleading statements concerning Five Below's trend-right merchandising capabilities, inventory controls, shrink, and operational performance, Five Below has been subjected to substantial litigation exposure and has incurred, and continues to incur, significant legal expenses. The Company has been required to defend itself and certain Individual Defendants in related shareholder litigation and has expended substantial corporate resources responding to multiple shareholder demands arising from the same underlying misconduct alleged herein.

### A.  The Securities Class Action

132.    On or about August 1, 2024, the Securities Class Action was commenced in the United States District Court for the Eastern District of Pennsylvania against Five Below, Anderson and Bull on behalf of purchasers of Five Below common stock.

133.    The Securities Class Action asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder arising from substantially the same misconduct alleged herein. Among other things, the operative complaint alleges that Five Below, Anderson and Bull made materially false and misleading statements concerning the Company's purported ability to execute its trend-right merchandising strategy, effectively manage shrink, maintain appropriate inventory controls and allocation practices, successfully implement its expansion initiatives, and misleadingly attributed the Company's deteriorating performance principally to shrink and other external factors.

- 42 -

134.   The defendants in the Securities Class Action moved to dismiss the operative complaint. By Memorandum and Order entered on August 25, 2025, the Honorable Gerald A. McHugh granted the motion in part and denied it in substantial part, holding that the complaint adequately alleged that numerous challenged statements were materially false and misleading and sufficiently pleaded scienter as to Anderson and Bull.

135.   In particular, the Court concluded that plaintiffs had plausibly alleged that Five Below was unable to stock stores with trending items and instead filled stores with unpopular merchandise that disappointed customers. The Court further recognized that the relevant issue was not Five Below's ability to identify trends in the abstract, but rather its inability to execute its purported trend-right strategy by ensuring that desirable merchandise actually reached store shelves. The Court's ruling therefore concerned the effectiveness of Five Below's merchandising, inventory-allocation, and inventory-control systems and held that plaintiffs had adequately alleged that numerous challenged statements concerning the Company's merchandising capabilities and the causes of its deteriorating performance were materially misleading.

136.   The Securities Class Action remains pending. Class certification proceedings remain ongoing and, pursuant to stipulation and order entered on May 20, 2026, fact discovery was extended from June 30, 2026 to October 15, 2026 and remains ongoing. The parties have engaged in extensive discovery, including the production of several hundred thousand pages of documents and numerous depositions. See *Securities Class Action*, ECF No. 74.

137.   The continued prosecution of the Securities Class Action following the denial of Defendants' motion to dismiss is particularly significant because the SLC subsequently concluded that substantially similar disclosure and fiduciary claims lacked merit notwithstanding the federal court's determination that investors had plausibly alleged materially false and misleading

- 43 -

statements and scienter as to certain defendants. The SLC reached this conclusion despite the fact that the Securities Class Action remains actively litigated and substantial discovery is ongoing.

**B.  Shareholder Demands and the Special Litigation Committee**

138.    Following the disclosures described above and the commencement of the Securities Class Action, multiple Five Below shareholders served litigation demands upon the board requesting that the Company investigate and pursue claims arising from the same underlying misconduct. According to Five Below's public disclosures, the Company received a total of six shareholder demands asserting substantially similar allegations concerning the misconduct described herein.

139.    Plaintiff likewise submitted a Litigation Demand requesting that the Board investigate and pursue claims against the Individual Defendants arising from the misconduct alleged herein. Rather than cause Five Below to evaluate and pursue those claims, the Board delegated the demands to a SLC.

140.    As publicly disclosed by Five Below in its 2025 Annual Report (Form 10-K filed March 19, 2026), the Board formed the SLC to investigate the allegations contained in the shareholder demand letters. The Company has further publicly disclosed that, on September 10, 2025, the SLC completed its investigation and determined that it would not be in the Company's "best interests to pursue litigation or take other steps in response to the demand letters." The Board adopted the SLC's recommendation and refused the shareholder demands.

**C.  The Related Derivative Actions**

141.    Following the Board's refusal of shareholder demands, multiple shareholder derivative actions asserting substantially similar allegations were filed arising from the same underlying misconduct alleged herein. According to Five Below's public disclosures, four

- 44 -

derivative actions were filed following the SLC's refusal of the shareholder demands, including two actions in the United States District Court for the Eastern District of Pennsylvania and two actions in the Philadelphia County Court of Common Pleas.

142.   By Joint Stipulation and Order dated December 12, 2025, the court consolidated the federal actions for all purposes under the caption *In re Five Below, Inc. Shareholder Derivative Litigation*, Civil Action No 25-5700 (E.D. Pa.), bearing the notation "Consolidated with 25-6046." The court further stayed the consolidated derivative proceeding, including Defendants' obligation to answer, move, or otherwise respond to the operative complaint and all merits discovery, in light of the overlapping Securities Class Action and the anticipated completion of fact discovery therein. The stay order contemplated that the schedule in the derivative action could be revisited as the Securities Class Action progressed. Five Below has further disclosed that the two derivative actions pending in the Philadelphia Country Court of Common Pleas likewise have been stayed by agreement of the parties pending the Securities Class Action.

143.   Importantly, the parties acknowledged the existence of the SLC report that had been produced to the derivative plaintiffs and expressly agreed that, by entering into the stipulation and stay, they were not waiving, limiting, or prejudicing any rights, arguments, or objections relating to the SLC report or the appropriateness of further discovery concerning the SLC report. The court further required the parties to meet and confer regarding the scope and production of discovery related to the SLC's independence and investigative process, including interview materials, Board and committee minutes, and custodian and data-related information, thereby recognizing that the SLC's independence, investigative process, and conclusions remained disputed issues.

- 45 -

## COMPANY STOCK REPURCHASES AND INSIDER TRADING

### A. The Individual Defendants Caused Five Below to Repurchase Shares at Artificially Inflated Prices, Resulting in Corporate Waste

144.    While Five Below's common stock traded at artificially inflated prices as a result of the Individual Defendants' material misrepresentations and omissions concerning the Company's trend-right merchandising capabilities, shrink, inventory controls, and operational performance, the Individual Defendants caused the Company to expend substantial corporate resources repurchasing its own stock.

145.    On June 14, 2022, Five Below's Board of Directors approved a share repurchase program authorizing the repurchase of up to $100 million of the Company's common stock through June 30, 2025. Pursuant to that authorization, Five Below repurchased 504,369 shares of its common stock during fiscal 2023 at an aggregate cost of approximately $80.0 million, or an average price of approximately $158.63 per share.

146.    On November 27, 2023, the Board retired that program and approved a new share repurchase program authorizing the repurchase of up to an additional $100 million of the Company's common stock through November 27, 2026. Pursuant to that authorization, Five Below repurchased an additional 266,997 shares during fiscal 2024 at an aggregate cost of approximately $40.0 million, or an average price of approximately $149.79 per share.

147.    In total, Five Below expended approximately $120 million repurchasing 771,366 shares of its common stock during the Relevant Period.

148.    As alleged in Plaintiff's Litigation Demand and throughout this Complaint, these repurchases were executed while Five Below's stock traded at prices artificially inflated by the Individual Defendants' false and misleading statements and omissions concerning the Company's true operational condition, merchandising execution, inventory allocation, inventory controls, and

prospects. By causing the Company to repurchase its own shares at prices inflated by their misconduct, the Individual Defendants caused Five Below to expend substantial corporate assets acquiring shares at prices higher than the Company otherwise would have paid had the market been aware of the true facts.

149.   The repurchases further signaled to investors that Five Below's Board and senior management believed that purchasing Company stock at prevailing market prices represented an appropriate and prudent use of corporate capital. In reality, the Individual Defendants knew, or consciously disregarded, that Five Below was experiencing significant internal failures relating to merchandising execution, inventory allocation, inventory controls, and the implementation of its expansion strategy.

150.   At the time the repurchases were authorized and executed, the Individual Defendants had access to internal operational, merchandising, inventory, financial, and performance information concerning those deficiencies, including information concerning declining product performance, inventory allocation problems, deteriorating merchandising execution, and other operational issues that later became the subject of management admissions and corrective disclosures. Nevertheless, the Individual Defendants caused the Company to deploy approximately $120 million of shareholder capital to repurchase Company stock while the market allegedly lacked complete and accurate information concerning the Company's operational condition.

151.

152. Had the market been informed of the Company's deteriorating merchandising execution, inventory deficiencies, operational shortcomings, and the extent to which those issues contributed to declining performance, Five Below could have repurchased substantially more shares for the same expenditure of corporate funds or could have preserved those funds for other legitimate corporate purposes. The Company's repurchases therefore caused direct economic harm by requiring Five Below to expend corporate assets at allegedly inflated prices.

153. Because the Individual Defendants authorized, approved, recommended, or permitted these repurchases while in possession of material, adverse, non-public information concerning Five Below's operational condition, merchandising deficiencies, inventory problems, and deteriorating performance, the repurchases were not the product of a valid exercise of business judgment. Rather, the repurchases constituted corporate waste and a breach of the Individual Defendants' fiduciary duties.

154. As a direct and proximate result of the foregoing misconduct, Five Below suffered damages by expending approximately $120 million of corporate funds to repurchase shares at prices allegedly inflated by the Individual Defendants' misconduct. Once the concealed facts concerning the Company's operational deficiencies and prospects were revealed through the corrective disclosures described herein, including the June 5 and July 16, 2024 disclosures, Five Below's stock price declined substantially, demonstrating that the Company paid materially more for the repurchased shares than it otherwise would have paid had investors been aware of the truth.

**B. Certain Individual Defendants Profited from Insider Sales While in Possession of Material Non-Public Information**

155.   While Five Below was expending corporate resources to repurchase shares at artificially inflated prices, certain Individual Defendants were simultaneously liquidating significant portions of their personal holdings of Five Below common stock while allegedly in possession of material, adverse, non-public information concerning the Company's merchandising execution, inventory deficiencies, operational performance, and deteriorating business condition.

156.   During the Relevant Period, Defendants Anderson, Bull, Barclay, Buggeln, Sargent, and Vellios (the "Insider Selling Defendants") sold approximately 144,430 shares of Five Below common stock for proceeds totaling approximately $28,105,707, as summarized below:

| Defendant | Date of Sale | Shares Sold | Share Price | Sale Proceeds |
|---|---|---|---|---|
| Anderson | 12/2/2022 | 10,000 | $185.57 | $1,855,700 |
| Anderson | 3/9/2023 | 2,390 | $199.53 | $476,877 |
| Anderson | 3/16/2023 | 1,072 | $195.33 | $209,394 |
| Anderson | 4/11/2023 | 13,653 | $218.97 | $2,989,597 |
| Anderson | 3/7/2024 | 1,814 | $206.96 | $375,425 |
| Anderson | 3/9/2024 | 1,642 | $204.82 | $336,314 |
| Anderson | 3/21/2024 | 7,290 | $176.79 | $1,288,799 |
| **Anderson Total** | | **37,861** | | **$7,532,106** |
| | | | | |
| Bull | 12/2/2022 | 7,000 | $182.40 | $1,276,800 |
| Bull | 3/7/2024 | 272 | $206.96 | $56,293 |
| Bull | 3/9/2024 | 256 | $204.82 | $52,434 |
| Bull | 3/21/2024 | 914 | $176.79 | $161,586 |
| **Bull Total** | | **8,442** | | **$1,547,113** |

- 49 -

| | | | | |
|---|---|---|---|---|
| Barclay | 12/2/2022 | 3,319 | $187.10 | $620,985 |
| Barclay | 3/30/2023 | 2,500 | $202.38 | $505,950 |
| **Barclay Total** | | **5,819** | | **$1,126,935** |
| | | | | |
| Buggeln | 12/2/2022 | 2,253 | $218.04 | $491,240 |
| **Buggeln Total** | | **2,253** | | **$491,240** |
| | | | | |
| Sargent | 4/4/2023 | 5,000 | $203.40 | $1,017,000 |
| Sargent | 6/7/2023 | 5,055 | $209.11 | $1,057,036 |
| **Sargent Total** | | **10,055** | | **$2,074,036** |
| | | | | |
| Vellios | 12/2/2022 | 50,000 | $181.86 | $9,093,052 |
| Vellios | 4/11/2023 | 20,000 | $219.15 | $4,383,000 |
| Vellios | 1/23/2024 | 10,000 | $185.82 | $1,858,225 |
| **Vellios Total** | | **80,000** | | **$15,334,277** |
| | | | | |
| **GRAND TOTAL** | | **144,430** | | **$28,105,707** |

157.   The timing, magnitude, and concentration of these transactions support an inference that the Insider Selling Defendants personally benefited while Five Below stock allegedly traded at artificially inflated prices. As reflected above, the Insider Selling Defendants collectively generated more than $28 million in proceeds while Five Below stock traded at prices ranging from approximately $176 to $219 per share, well before the June 2024 and July 2024 disclosures that revealed the Company's operational deficiencies and precipitated sharp declines in Five Below's stock price. Moreover, according to the allegations in the Securities Class Action, Anderson and

- 50 -

Bull had not sold Five Below stock during the comparable nineteen-month period preceding the Relevant Period, yet sold shares after the misconduct alleged herein commenced and while investors allegedly remained unaware of the Company's true operational condition.

158.   Notably, Defendant Vellios alone generated approximately $15.3 million in proceeds, representing more than fifty percent of the total proceeds obtained by the Insider Selling Defendants during the Relevant Period.

159.   The Insider Selling Defendants completed the foregoing sales before Five Below disclosed the operational deficiencies described herein and before the June 5, 2024 and July 16, 2024 corrective disclosures caused substantial declines in the Company's stock price. By selling before the market learned the truth concerning Five Below's deteriorating merchandising execution, inventory allocation deficiencies, and related operational failures, the Insider Selling Defendants allegedly avoided the risk that their shares would be sold at materially lower prices following those disclosures.

160.   Upon information and belief, the Insider Selling Defendants possessed material, non-public information by virtue of their positions within the Company, their access to internal reports, Board and committee materials, operational and financial information, and their participation in overseeing Five Below's disclosures, operations, and strategic initiatives. Anderson and Bull, by virtue of their senior executive positions, possessed particularly extensive access to internal operational, merchandising, inventory, financial, and performance information concerning the matters described herein.

161.   The Insider Selling Defendants owed fiduciary duties requiring them to refrain from using confidential corporate information for personal benefit and to abstain from trading in Company securities while in possession of material, non-public information. By selling Five

Below stock while allegedly in possession of material, adverse, non-public information concerning the matters described herein, the Insider Selling Defendants breached those fiduciary duties and were unjustly enriched at the expense of the Company and its shareholders.

162. Particularly troubling, these insider sales occurred during the same period in which the Insider Selling Defendants caused Five Below to expend corporate funds repurchasing its own stock. Thus, while the Company was deploying shareholder capital to acquire shares at artificially inflated prices, insiders were simultaneously monetizing their personal holdings at those allegedly inflated prices. This juxtaposition underscores the unfairness of the challenged conduct and further demonstrates that the repurchases were not the product of a valid exercise of business judgment.

163. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

164. As a direct and proximate result of the foregoing misconduct, Five Below has suffered substantial damages, including the waste of corporate assets through inflated stock repurchases, the costs associated with the related shareholder litigation, and the unjust enrichment of certain insiders who personally profited while the Company's true operational condition remained concealed.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES AND CORPORATE GOVERNANCE OBLIGATIONS

### A. Fiduciary Duties of the Individual Defendants

165.    By virtue of their positions as officers and/or directors of Five Below, the Individual Defendants owed fiduciary duties to the Company and its shareholders and were required to act in good faith, with due care, and in a manner they reasonably believed to be in the best interests of Five Below.

166.    The Individual Defendants were required to exercise the utmost good faith in the management, administration, and oversight of Five Below's affairs and to faithfully discharge their responsibilities in a manner consistent with their fiduciary obligations. Among other things, the Individual Defendants were obligated to place the interests of Five Below above their own personal interests and to refrain from engaging in conduct that would harm the Company.

167.    As fiduciaries, the Individual Defendants owed Five Below duties of loyalty, due care, candor, and good faith. These duties required them to act honestly and in the best interests of the Company, to exercise reasonable diligence and oversight, to make informed decisions based upon appropriate inquiry, and to ensure that material information concerning the Company's operations and prospects was accurately disclosed.

168.    The Individual Defendants were further obligated to oversee processes reasonably designed to promote compliance with applicable laws and regulations, maintain appropriate internal controls and reporting systems, safeguard corporate assets, and implement oversight mechanisms designed to identify and address material risks affecting the Company.

169.    The Individual Defendants had a duty to ensure that Five Below's public statements, including SEC filings, earnings releases, earnings calls, investor presentations, and other communications with investors and the market, did not contain materially false or misleading

- 53 -

statements or omit material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

170. The Individual Defendants also had a duty to disclose material information concerning Five Below's operations, performance, and prospects when necessary to ensure that the Company's public disclosures were accurate and complete and did not create a misleading impression regarding the Company's true condition.

171. As alleged herein, the Individual Defendants failed to fulfill these obligations by permitting and/or causing Five Below to repeatedly tout its purported ability to identify, source, and deliver trend-right merchandise while concealing significant operational deficiencies that impaired the Company's ability to execute that strategy. The Individual Defendants further permitted and/or caused the Company to attribute its deteriorating performance primarily to shrink and broader macroeconomic conditions while failing to disclose material facts concerning deficiencies in merchandising execution, inventory allocation, inventory management, and operational controls.

172. The Individual Defendants also owed fiduciary duties requiring them to protect and preserve Five Below's assets and to refrain from authorizing transactions that constituted waste of corporate resources or otherwise lacked a legitimate corporate purpose. Those duties included the obligation to ensure that corporate funds were expended prudently and in the best interests of the Company.

173. In addition, the Individual Defendants owed fiduciary duties prohibiting them from using confidential corporate information for personal benefit. The Individual Defendants were required to refrain from trading in Five Below securities while in possession of material, adverse, non-public information concerning the Company and to avoid placing their personal financial

- 54 -

interests above those of Five Below and its shareholders.

174.    By virtue of their senior positions within Five Below, the Individual Defendants had access to confidential and proprietary information concerning the Company's business, operations, internal reporting systems, merchandising initiatives, inventory management practices, shrink mitigation efforts, and financial performance. The Individual Defendants also had the authority and ability to prevent or correct the misconduct alleged herein.

175.    Despite these duties and obligations, the Individual Defendants consciously disregarded, failed to address, and/or caused the misconduct alleged in this Complaint. Rather than acting in the best interests of Five Below, the Individual Defendants breached their fiduciary duties by permitting and/or causing the dissemination of materially false and misleading statements, failing to ensure appropriate oversight and controls, wasting corporate assets, and unjustly enriching themselves at the expense of the Company and its shareholders.

176.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, Five Below has suffered substantial harm, including significant losses in market capitalization, exposure to costly litigation and investigations, expenditures of corporate resources responding to shareholder demands and related proceedings, waste of corporate assets, and other damages to be proven at trial.

**B.  Duties Arising under Five Below's Corporate Governance Guidelines**

177.    During the Relevant Period, Five Below maintained Corporate Governance Guidelines (the "Governance Guidelines") that set forth the Board's responsibilities and the standards governing the conduct of the Company's directors. The Governance Guidelines imposed specific obligations on the Director Defendants concerning oversight, risk management, compliance, and the safeguarding of Company assets.

178.    The Governance Guidelines provided that "[t]he primary function of the Board is to oversee the affairs of the Company for the benefit of the Company's shareholders." The Governance Guidelines further stated that the Board's responsibilities included "providing general strategic guidance and oversight of the Company's management" and overseeing management's operation of the Company's business.

179.    The Governance Guidelines required the Director Defendants to oversee the Company's principal risks and to satisfy themselves that appropriate systems existed to identify, monitor, and address those risks. In particular, the Governance Guidelines charged the Board with reviewing and understanding the Company's "principal risk exposures" and the steps management had taken to monitor and control such risks.

180.    The Governance Guidelines further required the Director Defendants to assist management in overseeing "processes designed to ensure compliance with applicable laws, rules and regulations and with the Company's Code of Business Conduct and Ethics." Accordingly, the Director Defendants had an affirmative obligation to oversee management's implementation of effective controls and compliance processes designed to prevent the type of misconduct alleged herein.

181.    The Governance Guidelines also provided that directors were required to perform their duties "in good faith, in a manner he or she reasonably believes to be in the best interests of the Company and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances."

182.    The Governance Guidelines further recognized that effective oversight required directors to remain informed. Accordingly, they provided that directors "shall have full and free access to any information about the Company that they deem necessary or appropriate to carry out

their duties." The Director Defendants therefore had both the authority and the means to obtain information necessary to fulfill their oversight responsibilities and to investigate indications that the Company's public disclosures and operational performance were inconsistent with internal realities.

183.    By virtue of these responsibilities, the Director Defendants were obligated to remain informed concerning Five Below's merchandising strategy, inventory practices, operational initiatives, disclosure practices, and the risks facing the Company. They were required to make reasonable inquiry into red flags suggesting that Five Below was experiencing difficulties executing its purported trend-right strategy or that the Company's public disclosures were incomplete or misleading.

184.    The Director Defendants were further obligated to ensure that Five Below's assets were safeguarded and used in the best interests of the Company. These duties included overseeing the Company's expenditures, evaluating whether significant uses of corporate capital served legitimate corporate purposes, and preventing the waste of corporate assets.

185.    As alleged herein, the Director Defendants failed to fulfill these obligations. Despite possessing broad authority to access information and oversee the Company's operations and risk management processes, they failed to adequately monitor and address known or knowable deficiencies relating to merchandising execution, inventory allocation and management, operational controls, and the Company's explanations concerning the causes of its deteriorating performance.

186.    The Director Defendants likewise failed to ensure that appropriate processes existed to prevent the dissemination of materially false and misleading statements concerning Five Below's ability to identify and deliver trend-right merchandise, the effectiveness of its shrink

mitigation efforts, and the extent to which internal operational failures contributed to the Company's disappointing results.

187. Had the Director Defendants fulfilled the responsibilities imposed by the Governance Guidelines, they reasonably could have discovered and addressed the misconduct alleged herein, caused Five Below to make truthful disclosures, prevented the waste of corporate assets, and mitigated the substantial harm ultimately suffered by the Company.

188. Instead, the Director Defendants failed to exercise the oversight, diligence, and reasonable inquiry required by Five Below's own Governance Guidelines, thereby breaching the duties they owed to the Company and contributing to the injuries alleged in this Complaint.

### C. Audit Committee Duties

189. During the Relevant Period, certain Director Defendants served on Five Below's Audit Committee (the "Audit Committee"). Pursuant to Five Below's Audit Committee Charter (the "Audit Charter"), the members of the Audit Committee assumed specific responsibilities relating to the integrity of the Company's financial reporting, the adequacy of its disclosure controls and internal controls, compliance with legal and regulatory requirements, risk oversight, and the investigation of potential misconduct.

190. The Audit Charter further provided that the Committee possessed authority to initiate investigations and retain legal, accounting, and other outside advisors as necessary to fulfill its duties under the Charter and applicable law.

191. The Audit Charter provided that the Audit Committee's purpose was to assist the Board in fulfilling its oversight responsibilities relating to: "(i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent registered public accounting firm's qualifications and independence; and (iv) the

performance of the Company's internal audit function and independent registered public accounting firm."

192. The Audit Committee was specifically charged with reviewing and discussing with management the quality and integrity of Five Below's financial reporting and disclosure processes. The Audit Committee was further responsible for reviewing the Company's quarterly and annual financial statements and the disclosures contained in the Company's SEC filings before such filings were made public.

193. The Audit Charter further required the Audit Committee to review with management its assessment of the effectiveness and adequacy of the Company's internal control structure and procedures for financial reporting. The Audit Committee was also tasked with reviewing management's evaluation of the Company's disclosure controls and procedures.

194. Consistent with these obligations, the Audit Committee was required to discuss with management and the Company's advisors any significant deficiencies or material weaknesses in internal controls, any fraud involving management or employees with a significant role in the Company's control environment, and any significant findings arising from internal investigations.

195. The Audit Committee also possessed full authority to obtain information necessary to perform its oversight responsibilities and therefore could not discharge its duties by remaining passive in the face of information suggesting operational, disclosure, or internal-control deficiencies.

196. The Audit Committee additionally bore responsibility for reviewing with the Company's counsel legal and regulatory matters that could have a significant impact on the Company's financial statements, disclosure obligations, compliance policies, business operations, or reputation, including material litigation, governmental investigations, and allegations of

wrongdoing.

197.    The Audit Charter also required the Audit Committee to discuss with management the Company's major financial risk exposures and the steps management had taken to monitor and control those risks. Accordingly, the Audit Committee was responsible for overseeing the processes by which management identified, assessed, and addressed risks affecting Five Below's operations and public disclosures.

198.    By virtue of these responsibilities, the Audit Committee members had an obligation to remain informed concerning matters affecting Five Below's merchandising execution, inventory practices, shrink mitigation efforts, disclosure controls, and the risks associated with the Company's expansion initiatives to the extent such matters impacted the Company's public disclosures, internal controls, financial reporting, and risk profile.

199.    As alleged herein, the Audit Committee members failed to discharge these responsibilities. Despite their obligation to oversee the integrity of Five Below's disclosures and the effectiveness of the Company's internal controls, they failed to ensure that appropriate reporting and control systems existed to identify and address deficiencies relating to merchandising execution, inventory allocation, inventory management, and disclosure practices.

200.    The Audit Committee members further failed to prevent or correct the dissemination of materially false and misleading statements concerning Five Below's purported ability to execute its trend-right strategy, effectively manage shrink, and accurately explain the causes of the Company's deteriorating financial performance.

201.    Had the Audit Committee members fulfilled the duties imposed upon them by the Audit Charter, they could have discovered, investigated, and addressed the misconduct alleged herein, caused corrective disclosures to be made, and mitigated the substantial harm suffered by

the Company.

202.    Instead, the Audit Committee members failed to exercise the oversight, inquiry, and diligence required by the Audit Charter and thereby breached the duties they owed to the Company, contributing to the damages and injuries alleged in this Complaint.

### D.  Compensation Committee Duties

203.    During the Relevant Period, certain Director Defendants served on Five Below's Compensation Committee (the "Compensation Committee"). Pursuant to Five Below's Compensation Committee Charter (the "Compensation Charter"), the Compensation Committee assumed specific responsibilities relating to executive compensation, incentive compensation, equity awards, and the alignment of management incentives with the long-term interests of the Company and its shareholders.

204.    The Compensation Charter provided that the Compensation Committee was responsible for "discharg[ing] certain responsibilities of the Board relating to compensation of the Company's executive officers." Among other things, the Compensation Committee was charged with reviewing and approving the compensation of Five Below's executive officers and administering the Company's equity-based compensation programs.

205.    The Compensation Committee was further responsible for reviewing annually and approving "the corporate goals and objectives relevant to the compensation of the Chief Executive Officer," evaluating the Chief Executive Officer's performance in light of those goals and objectives, and determining and approving the Chief Executive Officer's compensation based upon that evaluation.

206.    The Compensation Committee also was charged with reviewing and approving the compensation of the Company's other executive officers, including the establishment and

administration of incentive compensation arrangements tied to Company performance and strategic objectives.

207. In carrying out these responsibilities, the Compensation Committee was required to ensure that executive compensation programs promoted the long-term interests of Five Below and its shareholders, rewarded legitimate performance, and promoted the long-term interests of Five Below and its shareholders and aligned executive incentives with the Company's actual performance and strategic objectives.

208. The Compensation Committee exercised authority over equity awards and other forms of contingent compensation and therefore was responsible for ensuring that executive compensation decisions were based upon accurate information regarding the Company's performance and prospects.

209. As alleged herein, the Compensation Committee members failed to fulfill these responsibilities. The Compensation Committee approved and/or permitted the payment of substantial compensation and incentive-based awards to senior executives during a period in which Five Below's reported performance and market valuation were allegedly inflated by materially false and misleading statements concerning the Company's trend-right capabilities, inventory practices, shrink-related challenges, and operational condition.

210. The Compensation Committee members further failed to take appropriate action to address the risks associated with compensation structures that rewarded management while the Company allegedly concealed significant operational deficiencies and disseminated misleading disclosures to investors and the market.

211. By failing to exercise appropriate oversight regarding executive compensation and incentive arrangements, the Compensation Committee members permitted certain executives to

receive compensation and other financial benefits to which they would not otherwise have been entitled had Five Below's true operational condition and performance been accurately disclosed.

212.    Had the Compensation Committee members fulfilled the obligations imposed by the Compensation Charter, they would have ensured that executive compensation decisions were based upon accurate information concerning Five Below's performance and prospects and would have prevented or mitigated the unjust enrichment and resulting harm alleged herein.

213.    Instead, the Compensation Committee members failed to exercise the diligence, oversight, and judgment required by the Compensation Charter and thereby breached the duties they owed to Five Below, contributing to the damages and injuries suffered by the Company.

**E.  Duties Under Five Below's Code of Business Conduct and Ethics**

214.    During the Relevant Period, Five Below maintained a Code of Business Conduct and Ethics (the "Code of Ethics") applicable to the Company's directors, officers, and employees. The Code of Ethics established standards of conduct designed to promote integrity, compliance with applicable laws, the protection of Company assets, and accurate disclosures to investors and the public.

215.    The Code of Ethics emphasized that Five Below was committed to conducting its business in accordance with "the highest standards of integrity, honesty and compliance with the law." The Code further provided that the Company's directors, officers, and employees were expected to act in a manner consistent with those principles in all aspects of Five Below's operations.

216.    The Code of Ethics required that Five Below's public disclosures be truthful and complete. Specifically, the Code provided that the Company was committed to "full, fair, accurate, timely and understandable disclosure" in reports and documents filed with the SEC and in other

public communications made by the Company.

217.   The Code of Ethics further provided that "[d]ishonest or unethical conduct or conduct that is illegal will constitute a violation of this Code." Directors, officers, and employees were prohibited from engaging in conduct involving deception, concealment, or the misrepresentation of material facts.

218.   The Code of Ethics expressly prohibited directors, officers, and employees from taking unfair advantage of anyone through "manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice." Accordingly, the Individual Defendants were prohibited from concealing material information concerning Five Below's operations and prospects or otherwise misleading investors, regulators, or shareholders.

219.   The Code of Ethics further provided that "[t]he honesty and integrity of our business conduct must not be compromised." The Code emphasized that the Company would not condone ethical violations for the sake of personal gain or perceived business advantage.

220.   The Code of Ethics required directors, officers, and employees to protect Five Below's assets and use those assets only for legitimate business purposes. The Code specifically recognized that "[t]heft, carelessness and waste have a direct impact on the Company's profitability."

221.   The Code of Ethics further required that Five Below maintain accurate books, records, and accounts and prohibited the creation or maintenance of false or misleading records. The Code emphasized the importance of integrity in the Company's accounting and reporting practices.

222.   In addition, the Code of Ethics prohibited insider trading and provided that directors, officers, and employees were forbidden from trading in Company securities while in

- 64 -

possession of material, non-public information concerning Five Below. The Code further prohibited the use of confidential Company information for personal benefit.

223. The Code of Ethics also provided that "[n]o management employee, officer or director may override or circumvent our internal controls," nor may any such person "knowingly falsify any book, record or account" relating to the Company's operations or financial condition.

224. By virtue of these provisions, the Individual Defendants had express obligations to ensure that Five Below's public statements and SEC filings were accurate and complete; to refrain from concealing material information; to safeguard the Company's assets; to maintain effective internal controls; and to avoid using confidential Company information for personal gain.

225. As alleged herein, the Individual Defendants violated these obligations by permitting and/or causing Five Below to disseminate materially false and misleading statements concerning the Company's purported ability to execute its trend-right merchandising strategy and the causes of its deteriorating performance, while concealing material information regarding operational deficiencies involving merchandising execution, inventory allocation, inventory management, and related controls.

226. The Individual Defendants further violated the standards embodied in the Code of Ethics by failing to prevent the waste of corporate assets through the repurchase of Five Below stock at artificially inflated prices and, upon information and belief, by permitting certain officers to personally benefit from transactions in Company securities while allegedly in possession of material, non-public information.

227. Had the Individual Defendants complied with the requirements of the Code of Ethics, they would have ensured accurate and complete disclosures to investors, protected Five Below's assets, maintained appropriate controls and reporting practices, and avoided the

substantial harm ultimately suffered by the Company.

228.    Instead, the Individual Defendants disregarded and failed to adhere to the standards of honesty, integrity, transparency, and accountability set forth in Five Below's own Code of Ethics, thereby breaching the duties they owed to the Company and contributing directly to the injuries and damages alleged in this Complaint.

## DAMAGES TO FIVE BELOW

229.    As a direct and foreseeable consequence of misconduct by certain officers and directors, Five Below has suffered—and continues to suffer—substantial harm.

230.    Most notably, the Company is now a named defendant in the Securities Class Action, arising from the foregoing false and misleading statements. The Company faces the prospect of significant monetary liability, as well as ongoing legal fees and costs associated with defending or resolving that litigation and any related regulatory investigations. These exposures have already necessitated the engagement of outside counsel and consultants to support both litigation and internal risk assessments. The Company also has incurred substantial expenses associated with indemnification obligations, advancement of legal fees, preservation and collection of electronically stored information, and compliance with discovery obligations in the Securities Class Action and related proceedings. These expenditures represent direct corporate injuries independent of any recovery sought by investors in the Securities Class Action.

231.    On August 25, 2025, Judge Gerald A. McHugh of the Eastern District of Pennsylvania granted in part and denied in substantial part the motion to dismiss the Securities Class Action. The court concluded that plaintiffs had plausibly alleged that numerous challenged statements were materially false or misleading and further found that scienter had been adequately pleaded as to Anderson and Bull. As a result, Five Below continues to incur substantial expenses

- 66 -

associated with the defense of that litigation.

232.   Despite the misconduct alleged herein, certain officers and directors continued to receive substantial compensation, including salaries, incentive compensation, equity awards, and other benefits that were allegedly influenced by financial and operational metrics affected by the Company's misleading statements and omissions. These payments represent a waste of corporate assets and may be subject to recoupment under the Company's compensation and clawback policies.

233.   Adding to the financial harm, the Officers and Directors caused the Company to repurchase its own stock at prices allegedly inflated by the misleading statements and omissions described herein. In total, during the Relevant Period, Five Below repurchased more than 770,000 shares of its own stock, overpaying for those purchases. Had the market been informed of the Company's deteriorating merchandising execution, inventory deficiencies, operational shortcomings, and the extent to which those issues contributed to declining performance, Five Below could have repurchased substantially more shares for the same expenditure of corporate funds or could have preserved those funds for other legitimate corporate purposes. These buybacks therefore represented an unnecessary and avoidable outflow of shareholder capital.

234.   Additionally, multiple officers and directors sold Five Below stock while allegedly in possession of material, non-public information concerning the Company's operational condition, thereby obtaining substantial personal benefits while the Company itself repurchased shares at allegedly inflated prices. These transactions resulted in unjust enrichment and additional harm to the Company.

235.   The Company has also incurred substantial costs associated with responding to multiple shareholder litigation demands, establishing and operating the SLC,

- 67 -

████████████████████████████████████████████████████

███████████████████████████████████

236.   In sum, the foregoing misconduct has caused Five Below to suffer substantial corporate harm, including litigation and investigation expenses, indemnification and advancement costs, costs associated with responding to shareholder demands, expenses incurred in connection with the SLC investigation, waste of corporate assets through inflated stock repurchases, unjust enrichment of certain insiders, compensation paid during periods of alleged misconduct, and other damages to be proven at trial.

### DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

### A.  Plaintiff's Derivative Standing

237.   Plaintiff brings this action derivatively, in the right and for the benefit of Nominal Defendant Five Below, to redress injuries suffered, and to be suffered, by the Company as a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, violations of federal securities laws, and other unlawful conduct. Five Below is named as a nominal defendant solely in its derivative capacity.

238.   Plaintiff will adequately and fairly represent the interests of Five Below and its shareholders in enforcing and prosecuting the Company's rights.

239.   Plaintiff has been, and continuously has been, a holder of Five Below common stock throughout the wrongdoing alleged herein and remains a shareholder of the Company.

240.   As set forth herein, Plaintiff made a pre-suit Litigation Demand upon the Board requesting that the Company investigate and pursue claims arising from the misconduct alleged herein. The Board, acting through a purported SLC, wrongfully refused Plaintiff's Litigation Demand, thereby necessitating this derivative action.

241. Because the Board's refusal of Plaintiff's Litigation Demand was unreasonable, uninformed, not undertaken in good faith, and not the product of a valid exercise of business judgment under Pennsylvania law, this action should be permitted to proceed.

**B. Plaintiff's Litigation Demand Allegations**

   **i.   The December 29, 2025 Litigation Demand**

242. Before commencing this action, Plaintiff through counsel, served a shareholder litigation demand on Five Below's Board of Directors on December 29, 2025 (the "Litigation Demand"), addressed to Michael F. Devine, III, Chairman of the Board.

243. The Litigation Demand requested that the Board investigate and pursue appropriate remedies arising from the misconduct described herein, including commencing litigation against current and former Officers and Directors responsible for the Company's injuries, seeking recovery for damages sustained by the Company, implementing appropriate corporate governance reforms and taking all other actions necessary to remedy the wrongdoing.

244. The Litigation Demand detailed, among other things, allegations that certain current and former Officers and Directors breached fiduciary duties by causing or permitting the Company to make materially false and misleading statements regarding the causes of Five Below's deteriorating performance, failing to maintain adequate oversight over core operational functions, authorizing harmful stock repurchases while the Company's stock traded at artificially inflated prices, and permitting or engaging in insider trading and related misconduct.

   **ii.  The February 11, 2026 Response**

245. 

- 69 -

246. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

247. ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

248. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

249. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████

iii. ███████████████████████████████████████

250. ███████████████████████████████████████

███████████████████████████████████████████████████

████████

251. ███████████████████████████████████████

███████████████████████████████████████████████████



252.

253.

**iv.**

254.

255. [3]

256.

**C.**

257.

---

[3] A true and correct copy of the SLC Report is attached hereto as Exhibit C.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

258.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

259.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

i.    ████████████████████████████████████████████

260.    ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

261.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

262.    ████████████████████████████████████████

████████████████████████████████████████████████████

- 73 -

263.

- 74 -

264.

265.

- 75 -

266. ████████████████████████████████████████████

267. ████████████████████████████████████████████

268. ████████████████████████████████████████████

269. ████████████████████████████████████████████



270.



271. █████████████████████████████████

272. █████████████████████████████████

273. █████████████████████████████████

274. ███████████████████████████████████████

275. ███████████████████████████████████████

276. ███████████████████████████████████████



**ii.** ███████████████████████

277. ███████████████████████████████

278. ███████████████████████████████



279.

280.

281.

282.

283. █████████████████████████████████

284. █████████████████████████████████

285. █████████████████████████████████

286. █████████████████████████████████

287. ███████████████████████████████████

288. ███████████████████████████████████



289.

290.

291.

292.



293.

294.

295.

296.

297.

298.

299. ███████████████████████████████████

300. ███████████████████████████████████

301. ███████████████████████████████████



302.

303.

304.

305.

306.

307.

308.



309.

310.

**iii.** ██████████████████████████

311. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

312. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

313. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

314. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

315.

iv.

316.

317.

318.

319.

320.

321.

322.

323.

324.

## CLAIMS FOR RELIEF

## CLAIM I

**(Against the Individual Defendants for Breach of Fiduciary Duty)**

325.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

326.    By virtue of their positions as officers and/or directors of Five Below, the Individual Defendants owed the Company fiduciary duties of loyalty, due care, good faith, candor, oversight, reasonable inquiry, monitoring, supervision, and disclosure. These duties required them to act in the best interests of Five Below, to exercise informed and independent judgment in carrying out their responsibilities, to establish and maintain systems reasonably designed to provide accurate and timely information concerning the Company's operations, merchandising execution, inventory management, and financial performance, and to ensure that the Board, its committees, and shareholders received truthful, complete, and accurate information concerning matters material to the Company's business, operations, risks, and prospects.

327.    The Individual Defendants breached those duties by knowingly, recklessly, and/or in conscious disregard of their obligations failing to address and disclose material operational deficiencies affecting the Company. Among other things, Defendants failed to adequately oversee Five Below's merchandising execution, inventory allocation practices, and ability to identify and capitalize on consumer trends, despite publicly touting the Company's operational discipline and growth initiatives. The Individual Defendants further failed to implement and monitor systems reasonably designed to identify, report, and address deficiencies in merchandising execution, inventory allocation, shrink mitigation, and operational performance, thereby preventing the Board and senior management from receiving accurate and timely information concerning risks central to the Company's business.

- 92 -

328. Rather than disclose the operational shortcomings adversely affecting Five Below's performance, the Individual Defendants caused or permitted the Company to attribute declining sales and margin pressures primarily to external factors, including industry-wide shrink and organized retail theft, while omitting material information concerning Company-specific execution failures and their impact on the Company's results. The Individual Defendants further caused or permitted Five Below to issue SEC filings, earnings releases, conference call statements, and other public disclosures that omitted material facts necessary to render those statements not misleading.

329. The Individual Defendants further breached their fiduciary duties by authorizing, approving, recommending, or permitting the repurchase of Company stock while Five Below allegedly traded at artificially inflated prices and while material information concerning the Company's operational condition remained undisclosed.

330. The misconduct alleged herein was not undertaken in good faith or in the exercise of prudent business judgment. Instead, the Individual Defendants failed to protect the interests of Five Below and exposed the Company to substantial legal, financial, and reputational harm.

331. As a direct and proximate result of these breaches of fiduciary duty, Five Below has sustained significant damages, including costs associated with defending securities litigation and related proceedings, expenditures incurred investigating the misconduct alleged herein, damage to the Company's reputation and goodwill, litigation expenses, investigation costs, stock repurchase losses, indemnification expenses, unjust enrichment, and other damages.

332. Plaintiff, on behalf of Five Below, has no adequate remedy at law.

## CLAIM II

### (Against the Individual Defendants for Unjust Enrichment)

333.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

334.    By reason of their misconduct and breaches of fiduciary duty, the Individual Defendants received compensation, benefits, and other financial rewards to which they were not equitably entitled.

335.    The Individual Defendants unjustly retained salaries, bonuses, equity awards, director compensation, and other remuneration while failing to fulfill their duties owed to Five Below and while exposing the Company to the harm alleged herein.

336.    To the extent applicable, certain Defendants also profited through insider stock sales conducted while in possession of material, non-public information concerning the Company.

337.    Plaintiff seeks restitution, the imposition of a constructive trust where appropriate, and disgorgement of all profits, benefits, compensation, insider trading proceeds, and other remuneration wrongfully obtained by the Individual Defendants.

338.    Plaintiff, on behalf of Five Below, has no adequate remedy at law.

## CLAIM III

### (Against the Defendants Anderson, Bull, Barclay, Buggeln, Sargent, and Vellios, for Breach of Fiduciary Duty Through Insider Trading and Misappropriation of Company Information)

339.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

340.    Throughout the Relevant Period, Defendants Anderson, Bull, Barclay, Buggeln, Sargent, and Vellios (the "Insider Selling Defendants") sold substantial amounts of Five Below

stock while in possession of material, adverse, non-public information concerning the Company's true operational condition and business prospects.

341. Such information included, among other things, the Company's inability to effectively identify and capitalize on consumer trends, deficiencies in merchandising execution and inventory allocation, the resulting adverse impact on sales and margins, and the extent to which Defendants' public explanations attributing those results primarily to shrink and external factors were misleading.

342. This information constituted a valuable corporate asset belonging to Five Below and all of its shareholders. Rather than use that information for the benefit of the Company and its shareholders equally, the Insider Selling Defendants exploited it for their own personal gain.

343. By selling Company stock while in possession of material, non-public information, the Insider Selling Defendants breached their fiduciary duties of loyalty and good faith owed to Five Below.

344. As a direct and proximate result of these breaches, Five Below has suffered damages and is entitled to recover the profits realized by the Insider Selling Defendants from their insider sales.

345. Plaintiff, on behalf of Five Below, has no adequate remedy at law.

## CLAIM IV

### (Against the Individual Defendants for Waste of Corporate Assets)

346. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

347. As a result of the misconduct alleged herein, the Individual Defendants caused Five Below to waste valuable corporate assets.

348.     Such waste includes, among other things, causing the Company to repurchase shares at allegedly inflated prices and approving compensation and incentive awards despite the misconduct alleged herein.

349.     The challenged conduct could not reasonably have been believed to serve the Company's best interests and therefore did not constitute a valid exercise of business judgment. In particular, the Company's repurchases allegedly occurred while material adverse information concerning Five Below's operational condition, merchandising deficiencies, inventory problems, and deteriorating performance remained undisclosed.

350.     As a direct and proximate result of this waste of corporate assets, Five Below has sustained damages.

351.     Plaintiff, on behalf of Five Below, has no adequate remedy at law.

### CLAIM V

**(Against the Director Defendants for Violations of § 14(a) of the Exchange Act)**

352.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

353.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9 prohibit the solicitation of shareholder proxies through materially false or misleading statements or omissions.

354.     During the Relevant Period, the Director Defendants caused Five Below to disseminate proxy statements that contained materially false and misleading statements and omissions concerning, among other things, the Company's operational execution, merchandising capabilities, ability to identify and capitalize on consumer trends, the effectiveness of its growth initiatives, executive compensation, and the performance of the Board in overseeing the

Company's business and affairs.

355.    The proxy statements omitted material facts necessary to make the statements contained therein not misleading, including facts concerning: (a) the Company's inability to effectively execute its purported trend-right merchandising strategy; (b) deficiencies in inventory allocation, inventory controls, and merchandising execution; (c) the extent to which the Company's deteriorating performance was attributable to Company-specific operational failures rather than external factors such as shrink and organized retail theft; (d) the Board's failure to adequately oversee risks relating to merchandising, inventory management, and operational execution; (e) the Company's repurchase of shares at artificially inflated prices while material adverse information remained undisclosed; and (f) executive compensation and incentive awards that were tied, in whole or in part, to performance metrics, operational achievements, and business conditions that had been materially misrepresented to shareholders. The proxy materials further omitted material information concerning the Board's oversight failures and the extent to which the Company's reported operational success and executive performance metrics had been affected by undisclosed operational deficiencies. The proxy statements were used to secure shareholder approval for, among other things, the election of directors and advisory approval of executive compensation.

356.    The Director Defendants knew, or were reckless in not knowing, that the proxy statements omitted material information concerning the true state of the Company's operations and business performance.

357.    The materially misleading proxy statements induced shareholders to re-elect directors and approve executive compensation while withholding material information necessary for informed shareholder voting. The proxy solicitations were an essential link in obtaining shareholder approval for the election of directors and the approval of executive compensation.

358.    As a direct and proximate result of these violations, Five Below suffered damages.

359.    Plaintiff, on behalf of Five Below, has no adequate remedy at law.

**CLAIM VI**

**(Against Defendants Anderson and Bull for Contribution Under Sections 10(b) and 20D of the Exchange Act of 1934)**

360.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

361.    Defendants Anderson and Bull are named defendants in the Securities Class Action.

362.    This claim is brought derivatively on behalf of Five Below against Defendants Anderson and Bull for contribution pursuant to Sections 10(b) and 21D of the Securities Exchange Act of 1934.

363.    Five Below is also named as a defendant in the Securities Class Action, which asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 arising from substantially the same misconduct alleged herein, including materially false and misleading statements concerning the Company's trend-right merchandising capabilities, inventory management, shrink-related issues, operational execution, and financial performance.

364.    As alleged herein, Anderson and Bull directly participated in, authorized, approved, and/or caused the dissemination of the materially false and misleading statements and omissions challenged in the Securities Class Action. Anderson and Bull exercised substantial control over the Company's public disclosures, SEC filings, earnings releases, earnings calls, investor communications, and related statements concerning Five Below's operations and prospects.

365.    On August 25, 2025, the court in the Securities Class Action denied in substantial part Defendants' motion to dismiss and held, among other things, that plaintiffs had adequately alleged materially false and misleading statements and scienter as to Anderson and Bull.

- 98 -

366. To the extent Five Below incurs liability, damages, settlement obligations, judgments, defense costs, attorneys' fees, expenses, or other losses arising from the Securities Class Action, such liability will have resulted, in whole or in substantial part, from the wrongful conduct, acts, omissions, and breaches of duty of Anderson and Bull as alleged herein.

367. Anderson and Bull possessed the power and ability to control or influence the Company's public statements and disclosures, and they directly participated in the conduct that forms the basis of the Securities Class Action and the claims asserted herein.

368. Pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4, Five Below is entitled to seek contribution from Anderson and Bull for any liability, damages, settlement payments, costs, expenses, or other losses incurred by the Company arising from or related to the Securities Class Action.

369. As a direct and proximate result of the conduct of Anderson and Bull, Five Below has suffered and will continue to suffer damages in an amount to be determined at trial.

370. Plaintiff, on behalf of Five Below, has no adequate remedy at law.

## CLAIM VII

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against the Individual Defendants)**

371. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

372. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 prohibit the use of any manipulative or deceptive device or contrivance in connection with the purchase or sale of securities.

373. During the Relevant Period, the Individual Defendants knowingly or recklessly engaged in a fraudulent scheme by causing Five Below to disseminate materially false and

misleading statements and omissions concerning, among other thing:

- The Company's trend-right merchandising capabilities;

- Inventory management and operational execution;

- The causes of declining sales and margins

- The impact of shrink on financial performance; and

- The Company's ability to execute its growth strategy.

374. As alleged herein, the Individual Defendants knew, or were reckless in not knowing, that these statements and omission were materially false and misleading when made because they concealed Company-specific operational failures, merchandising deficiencies, inventory management problems, and execution failures that materially impaired the Company's business.

375. While Five Below's common stock traded at artificially inflated prices as a result of these materially false and misleading statements and omission, the Individual Defendants causes the Company to repurchase substantial amounts of its common stock pursuant to Board-authorized repurchase programs.

376. In connection with those repurchase, the Individual Defendants, directly and indirectly, by use of means and instrumentalities of interstate commerce and mails;

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material fact and omitted material facts necessary to make the statements made not misleading; and

c. engaged in acts, practices, and coursed of business that operated as a fraud or deceit upon Five Below.

377. The Individual Defendants acted knowingly or with recklessness and with scienter.

As alleged herein, they possessed material nonpublic information concerning the Company's true operational condition while causing the Company to repurchase its own shares at artificially inflated prices.

378.    The Company's' repurchases were made at prices materially inflated by Defendants' fraudulent conduct. But for Defendants' violations of Section 10(b) and Rule 10b-5, Five Below would not have repurchased its shares at the prices paid, or the quantities repurchased.

379.    As a direct and proximate result of Defendant's violations of Section 10(b) and Rule 10b-5, Five Below suffered substantial damages, including but not limited to losses resulting from repurchasing its own shares at artificially inflated prices, litigation costs, investigation expenses, and other consequential damages.

380.    Plaintiff brings this claim derivatively on behalf of Five Below to recover those damages.

## CLAIM VIII

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

381.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

382.    Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), provides that every person who directly or indirectly controls a person liable under the Exchange Act shall be jointly and severally liable with and to the same extent as the controlled persona unless the controlling person acted in good faith and did not directly or indirectly induce the violation.

383.    At all relevant times, each of the Officer Defendants exercised control over the Company's operations, public disclosures, SEC filings, earnings calls, and statements to investors.

384.    At all relevant times, each of the Director Defendants exercised control over the

- 101 -

Company's management, corporate policies, public disclosures, internal controls, and stock repurchase program through their service on the Board and its committees.

385. By virtue of their positions, authority participation in the Company's day-to-day operations, access to material nonpublic information, and ability to control the contents of Five Below's public statements and SEC filings, each of the Individual Defendants possessed the power to control and exercise control over, the primary violations of Section 10(b) and Rule 10b-5 alleged herein.

386. The Individual Defendants had the ability to prevent the issuance of materially false and misleading statements, prevent the omission of material facts, and prevent the Company from repurchasing its stock while market price remained artificially inflated, but failed to do so.

387. The Individual Defendants were culpable participants in the fraudulent conduct alleged herein.

388. By reason of the foregoing, the Individual Defendants are liable, jointly and severally. Pursuant to Section 20(a) of the Exchange Act for the damaged sustained by Five Below.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that Plaintiff's Litigation Demand was wrongfully refused, and that this action may proceed derivatively on behalf of Five Below;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, waste of corporate assets, and unjust enrichment.

C. Awarding, against Defendants Anderson and Bull and in favor of the Company, all

contributions, damages, losses, settlement amounts, judgments, attorneys' fees, defense costs, expenses, and other relief recoverable under Sections 10(b) and 20D of the Exchange Act arising from or relating to the Securities Class Action;

D.      Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

E.      Directing the Company to implement and maintain appropriate corporate governance, internal-control, oversight, disclosure-control, and compliance reforms designed to prevent the recurrence of the misconduct alleged herein, including, as appropriate, improvements to Board oversight, risk-management, merchandising and operational reporting, disclosure controls, compensation recoupment procedures, clawback policies, and other governance measures necessary to protect the Company and its shareholders;

F. Awarding restitution, disgorgement, recoupment, or clawback of compensation, incentive awards, stock-sale proceeds, and other benefits improperly received by any Defendant to the extent permitted by law;

G. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Dated: July 8, 2026                           Respectfully submitted,


**THE ROSEN LAW FIRM, P.A.**

/s/ *Olivia D. Simkins*_____
101 Greenwood Ave., Suite 520
Jenkintown, PA 19046
Telephone: (215) 600-2817
Email: osimkins@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: philkim@rosenlegal.com
Email: estone@rosenlegal.com

*Counsel for Plaintiff*


- 104 -

## VERIFICATION

I, Gabriel Bordenave am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.    12/17/2025

DocuSigned by:

69AAB166B9964C9...

Gabriel Bordenave